J-S63002-18

2019 PA Super 24

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                       :        PENNSYLVANIA
                                         :
                  v.                       :
                                         :
                                         :
LOTI MBEWE                         :
                                         :
             Appellant              :     No. 1004 WDA 2017

Appeal from the Judgment of Sentence February 16, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0006040-2016

BEFORE:    OTT, J., MURRAY, J., and STEVENS*, P.J.E.

OPINION BY OTT, J.:                            FILED FEBRUARY 1, 2019

      Loti Mbewe appeals from the judgment of sentence imposed on February 16, 2017, in the Court of Common Pleas of Allegheny County. Mbewe received a bench trial[1] on the charges of robbery – intent to inflict serious bodily injury (two counts), conspiracy – intent to inflict serious bodily injury, carrying a firearm without a license, person not to possess a firearm, and simple assault.[2] Mbewe was found guilty on both counts of robbery and conspiracy; he was acquitted of all other charges. He received an aggregate sentence of three to six years' incarceration to be followed by three years' probation. In this timely appeal, Mbewe claims that the trial court erred in failing to grant his motion

_____

* Former Justice specially assigned to the Superior Court.

[1] This was a combined suppression hearing and non-jury trial.

[2] 18 Pa.C.S. §§ 3701(a)(1), 903, 6106(a)(1), 6105(c)(1), and 2701(a)(3), respectively.

to suppress identification which resulted from an impermissibly suggestive photo lineup, and that the verdict was against the weight of the evidence. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The facts underlying this appeal are quite detailed. The parties are familiar with these facts, so we will not relate them herein. We refer to and rely on the findings of fact as related by the trial court in its comprehensive Pa.R.A.P. 1925(a) opinion of June 25, 2018. Specifically, in this regard we refer to pages 2-13, inclusive. Briefly, the victims in this matter, Ava Lewis and Elizabeth O'Leary, were seeking to purchase drugs from Joe Lewis.[3] Joe Lewis arrived at Ms. O'Leary's residence accompanied by a person later identified as Defendant, Loti Mbewe. Although Ava and Joe Lewis had prior contact with each other on Facebook, neither women had met Mbewe prior to his arrival at Ms. O'Leary's residence with Joe Lewis. Lewis and Mbewe robbed the two women at gunpoint, taking several hundred dollars.

Initially reluctant to report the crime, the two women eventually reported the robbery to the police. Although the description of Lewis's accomplice provided by the victims did not accurately describe Mbewe, one of the police officers had prior knowledge of both Lewis and Mbewe. Accordingly, when the officer heard the names Joe and Loti, he arranged for a pair of photo lineups, one for each man. Although Ava Lewis was unable to identify Mbewe

_____

[3] Joe Lewis and Ava Lewis are not related.

from the photographs, Ms. O'Leary identified the photograph of Loti Mbewe

with 95% certainty that she had identified the perpetrator.

In his first issue, Mbewe argues the trial court erred in failing to suppress

Ms. O'Leary's identification of him through an unduly suggestive photo array.

Our standard of review of an order denying a motion to suppress is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, "whose duty it is to determine if the suppression court properly applied the law to the facts." Thus, the conclusions of law of the courts below are subject to our plenary review.

Commonwealth v. Kemp, 195 A.3d 269, 275 (Pa. Super. 2018) (quoting

Commonwealth v. Jones, 988 A.2d 649, 654 (Pa. 2010).

Further,

> "Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances." Commonwealth v. Carson, 559 Pa. 460, 480, 741 A.2d 686, 697 (1999), cert. denied, 520 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000), abrogated on other grounds by Commonwealth v. Freeman, 573 Pa. 532, 827 A.2d 385 (2003). "Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but 'suggestiveness alone does not warrant exclusion.' " Commonwealth v. Kubis, 978 A.2d

> 391, 396 (Pa. Super. 2009). Identification evidence will not be suppressed "unless the facts demonstrate that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " Commonwealth v. Burton, 770 A.2d 771, 782 (Pa. Super. 2001), appeal denied, 582 Pa. 669, 868 A.2d 1197 (2005), overruled on other grounds by Commonwealth v. Mouzon, 571 Pa. 419, 429, 812 A.2d 617, 623 (2002), quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics. Commonwealth v. Fisher, 564 Pa. 505, 520, 769 A.2d 1116, 1126-1127 (2001).

Commonwealth v. Fulmore, 25 A.3d 340, 346 (Pa. Super. 2011).

Here, Mbewe does not argue that the photographs themselves were unduly suggestive. That is, he does not claim that his photograph stood out from the other photographs in the array in some manner, thereby calling undue attention to his photo. Rather, he argues the police based the photo array "on the abstract created by the victims' post-incident description." Appellant's Brief at 12. However, this argument is a mischaracterization of dicta taken from Fulmore, supra.

Similar to this matter, in Fulmore, the police created photo arrays based upon one of the officer's belief that Fulmore and another man, Kingwood, were one of the perpetrators of the crime, even though Kingwood did not precisely match the victim's description. A photo array with Kingwood's photo included was presented to the victim. The other photos in the array resembled Kingwood – not the physical description provided by the victim; just as in this matter, the other photos resembled Mbewe and not the

- 4 -

description provided by Ms. O'Leary. This was found to be the proper procedure. A panel of our Court stated:

> In compiling an array that would meet due process standards, Detective Harrigan was required to place photos in the array of individuals who resembled the suspect, Kingwood, not the abstract created by [the victim's] post-incident description.

Id. at 347. It appears that Mbewe has mistakenly argued that the identification of Mbewe and inclusion of his photo in an array of photos depicting faces similar to his, was the improper "abstract created by [the victim's] post-incident description." This would only be true if the other photos included in the array fit the victim's description, making Mbewe's photo stand out as different. Additionally, the mere fact that the photos in the array containing Mbewe's picture did not match the victim's description does not mean the identification process was unduly suggestive. See In re Love, 646 A.2d 1233, 1237 (Pa. Super. 1994) ("[T]here is no merit to the argument the identification process was unduly suggestive because the photos did not match the victim's description of her assailant.").

In light of the above, Mbewe is not entitled to relief on this aspect of his claim.

Regarding the motion to suppress, Mbewe also argues the evidence was unworthy of belief because of the high stress situation, cross-racial identification and a lack of independent basis for the identification. These challenges to the credibility of the evidence equate to a challenge to the weight of the evidence. See Commonwealth v. Griffin, 65 A.3d 932, 935 (Pa.

Super. 2013) ("This argument goes to the credibility of the witness's testimony, and is, therefore, not an attack on the sufficiency of the evidence, but an allegation regarding the weight it should have been afforded."). While we do not often review a weight of the evidence claim in terms of a motion to suppress, and there is little case law regarding this type of claim, we will treat this challenge to the weight of the evidence as we would any other such claim.[4] Accordingly, we must first determine if the claim has been preserved.

> As an initial matter, a challenge to the weight of the evidence must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Pa.R.Crim.P. 607(A)(1)-(3). "The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." Comment to Pa.R.Crim.P. 607. If an appellant never gives the trial court the opportunity to provide relief, then there is no discretionary act that this Court can review.

Commonwealth v. Jones, 191 A.3d 830, 834-35 (Pa. Super. 2018) (footnotes omitted).

Mbewe never raised his weight of the evidence arguments, as applied to the motion to suppress, before the suppression/trial court. Therefore, the challenge to the credibility of the evidence as specifically applied to the motion to suppress is waived.

_____

[4] Regarding a motion to suppress evidence, "questions of credibility and the weight to be accorded to witness testimony are issues within the sound discretion of the trial court." In re R.P., 918 A.2d 115, 117 (Pa. Super. 2007). This is a very difficult standard to challenge successfully. This may account for the relative paucity of weight of the evidence claims specifically tailored to motions to suppress.

However, Mbewe has properly preserved his claim that the verdict was against the weight of the evidence. See Mbewe's Post Sentence Motions, 2/24/2017. We emphasize this is a distinct claim from the prior argument regarding the motion to suppress.[5]

> The Supreme Court has set forth the following standard of review for weight of the evidence claims:
>
>> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>>
>> * * *
>>
>> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>>
>> * * *
>>
>> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate

---

[5] Mbewe raised separate claims regarding the weight of the evidence as applied to the motion to suppress and the verdict. Accordingly, we have addressed them separately. We recognize that the Commonwealth's burden of persuasion is not as stringent regarding a motion to suppress. There, the Commonwealth's burden of persuasion is by a fair preponderance of the evidence, not beyond a reasonable doubt. See *Commonwealth ex rel Butler v. Rundle*, 239 A.2d 426 (Pa. 1968); *Commonwealth v. Smith*, 784 A.2d 182 (Pa. Super. 2001). This difference supports our separate consideration of the challenges to the weight of the evidence.

> review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

> Commonwealth v. Clay, 619 Pa. 423, 64 A.3d 1049, 1054-55 (2013) (citations and quotation omitted). In order for an appellant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." Commonwealth v. Sullivan, 820 A.2d 795, 806 (Pa. Super. 2003) (citation omitted).

Commonwealth v. Roberts, 133 A.3d 759, 769-70 (Pa. Super. 2016).

Our review of the certified record reveals no abuse of discretion on the part of the trial court. The trial court's reasoning in accepting the identification testimony of Ms. O'Leary is amply based upon the record. We rely on the trial court's opinion, pages 14-21 in support of our decision.

In addition to the trial court's reasoning, we find no fault with the police providing a photo array that included Mbewe and persons with similar facial characteristics, even though Mbewe did not fit the physical description supplied by Ms. O'Leary. The police had been told that the perpetrators were one Caucasian and one African-American. Ms. O'Leary told the police she believed a person named "Loti" – no last name – may have been involved in the crime. Joe Lewis was positively identified by name. The police independently were aware that Joe Lewis, a Caucasian, was known to associate with a man named Loti Mbewe, an African-American. The police would have been remiss to ignore this information, despite the fact that Mbewe did not specifically match the overall physical description provided by Ms. O'Leary. As noted above, the fact that the photo array did not match the

physical description provided by the victim does not make the array impermissibly suggestive, and therefore, unreliable. See In re Love, supra.

Judgment of sentence affirmed. Parties are directed to attach a copy of the trial court opinion in the event of further proceedings.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  2/1/2019

Circulated 01/18/2019 11:25 AM

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,

v.

LOTI MBEWE,

**DEFENDANT.**

NO. 2016-6040

**1004 WDA 2017**

ORIGINAL
Criminal Division
Dept. Of Court Records
Allegheny County, PA

**FILED** 18 JUN 25 PM 2:17

## OPINION

IGNELZI, J.

## PROCEDURAL HISTORY

A criminal information was filed at 2016-6040 on September 12, 2015, Defendant was charged with two counts of Robbery-Intent to Inflict Serious Bodily Injury (18 Pa. C.S. § 3701 (a)(1); one count of Conspiracy- Intent to Inflict Serious Bodily Injury (18 Pa. C.S. § 903); one count of Carrying a Firearm Without a License (18 Pa. C.S. § 6106(a)(1)); one count of a Person not to Possess a Firearm (18 Pa. C.S. § 6105(c)(1)); and one count of Simple Assault (18 Pa. C.S. § 2701(a)(3)).

A Suppression Motion Hearing and simultaneous Non-Jury Trial commenced on November 18, 2016. At the conclusion of the proceeding, on November 21, 2016, this Court denied the Defendant's Suppression Motion and found the Defendant guilty of the two counts of Robbery-Intent to Inflict Serious Bodily Injury and the one count of Conspiracy. The Defendant was found not

0

guilty of the remainder of the counts. This Court then ordered a presentence investigation report and scheduled sentencing for February 16, 2017. On said date, this Court sentenced Defendant as to the first count of Robbery-Threat of Immediate Serious Injury to a minimum period of incarceration of 3 years and a maximum period of 6 years at SCI Camp Hill. A 3 year period of probation to be served consecutively to Defendant's confinement. No further penalties as were imposed as to the remaining counts. **Sentencing Transcript, "ST", dated February 16, 2017, at p. 11.**

On February 24, 2017, Defendant filed a Post-Sentence Motion. On June 12, 2017, said Motion was denied. On July 5, 2017, Defendant filed a Notice of Appeal to the Superior Court of Pennsylvania. By Order dated July 10, 2017, this Court ordered Defendant to file a Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. Rule 1925( b). After an Order granting an extension of time, Defendant filed his Concise Statement of Matters Claimed of on Appeal on February 12, 2018.

## STATEMENT OF ERRORS ON APPEAL

Defendant's Concise Statement lists the following issue for Appellate Review:

1. The Trial Court erred in denying Mr. Mbewe's pretrial motion for suppression of Ms. Ava Lewis and Ms. Elizabeth O'Leary's identification of the Defendant through photo arrays, where the physical description of the assailant did not match Defendant's physical description, namely his height and weight. In addition, it was unduly suggestive for Detective Baker to have a photo array presented to the witnesses under those circumstances.

2. The trial court's verdict was against the weight of the evidence because: (a) neither witness at trial was able to identify the Defendant as the

1

perpetrator of the robbery based upon their independent recollection of events and both witnesses alleged to have seen single photos of the Defendant from Instagram at the suggestion of a third party; (b) Detective Baker admitted the description of the actor did not match the physical description of the Defendant, but he included the Defendant's photo in the array due to the use of the name "Loti"; and (c) the victims waited a substantial period of time before reporting the robbery, which was the result of a botched drug transaction.

## FINDINGS OF FACT

For purposes of the Suppression Motion, the Commonwealth called Ava Lewis as its first witness. Ms. Lewis testified that as of the fall of 2015, she had known Elizabeth O'Leary (Lizzie) for approximately one year and they became friends. **Suppression and Nonjury Trial Transcript, "STT", dated November 18-21, 2016, p. 12, l. 17-24.** Ms. Lewis came to know a man Joe Lewis and Lizzie knew him personally. **STT at p. 13, l. 4-14.** Ms. Lewis testified that she messaged Joe Lewis on Facebook on September 12, 2015 looking for Percocet. **Id. at p. 13, l. 24-24 through p. 14, l. 1-11.** Actually, Ms. Lewis first updated her personal profile on Facebook indicating she was looking for percocet and then Mr. Lewis responded that he liked that posting and that is how the communication began. **Id. at p. 15, l. 1-23.** Ms. Lewis was with Lizzie at Lizzie's house in Carrick when the Facebook conversation occurred. **Id. at p. 16, l. 6-15.** After a price was agreed upon for the Percocet, Mr. Lewis found a ride to take him to Lizzie's house in Carrick. **Id. at p. 16, l. 21 through p. 18, l. 10.**

According to Ms. Lewis, Lizzie had her three month old daughter in the house when the incident happened. **Id. at p. 19, l. 18 through p. 20, l. 3.** She thought that they were to meet Joe Lewis inside the apartment on Lutz Avenue. **Id. at p. 20, l. 8-23.** Ms. Lewis stated the she was outside the apartment smoking

2

with Lizzie when Joe Lewis approached. Lizzie recognized him coming towards them as Ms. Lewis never met him before. **Id. at p. 22, l. 7-20.** Mr. Lewis had a friend with him and they ended up going up the stairs and into the apartment, along with Ms. Lewis and Lizzie. **Id. at p. 23, l. 5-24.** After they entered the apartment, Ms. Lewis testified she was in the living room and Lizzie was in the kitchen with the two men and she observed the friend of Mr. Lewis holding a gun. **Id. at p. 24, l. 2-25.** Ms. Lewis thought the gun was pointed at Lizzie at which point one of the men asked for their cell phones. **Id. at p. 25, l. 11-25.** Both women handed over their cell phones. **Id. at p. 26, l. 7-8 and 13-15.** Ms. Lewis recalled that the gun was black and it was a short one. **Id. at p. 27, l. 20-24.**

In addition to the cell phones, the two men also took money from the women. **Id. at p. 28, l. 18-21.** Ms. Lewis indicated she only had $12 on her person which they took from her. **Id. at p. 29, l. 2-4.** She believed that Lizzie had her money taken from her first while she was in the kitchen. **Id. at p. 29, l. 20-21.** After they had the phones and money, the men left. **Id. at p. 32, l. 10-14.** Ms. Lewis then went onto the porch to look for the phones, but she was not able to find them. **Id. at p. 33, l. 12 through p. 34, l. 5.** Ms. Lewis recalled that a little over a month after this incident speaking with the police, but she couldn't find anyone in the pictures she thought was involved in the robbery. **Id. at p. 34, l. 11-21.** She described the friend who arrived with Mr. Lewis as having a hood on, he was black, he was about 19 years old, he was taller than her and he was not fat. **Id. at p. 35, l. 19 through p. 36, l. 12.** On redirect examination, Ms. Lewis stated that a friend of the Defendant Mbewe showed her a picture of him on Instagram. **Id. at p. 46, l. 17-22.** What she means by this is that she saw a picture of the person

3

who was with Mr. Lewis when she got robbed on Instagram prior to the robbery. **Id. at p. 46, l. 23 through p. 47, l. 15**.

The Commonwealth next called Elizabeth O'Leary to testify. Ms. O'Leary testified that in the fall on 2015, Ava Lewis was her best friend for about a year. **Id. at p. 49, l. 10-17**. She indicated the residence at 2224 Lutz Avenue was her apartment in the Carrick area of the City of Pittsburgh. **Id. at p. 49, l. 18 through p. 50, l. 5**. She recalled that on September 12, 2015, the day of the robbery, she was at her apartment on Lutz Avenue with Ava Lewis in the afternoon. **Id. at p. 50, l. 6-13**. She also recalled Ms. Lewis communicating on Facebook to buy Vicodin and she knew Joseph Lewis through her friend, Bre Lewis, Joseph's sister. **Id. at p. 50, l. 14 through p. 51, l. 10**. She did not know a person named Loti. **Id. at p. 51, l. 23-24**.

Ms. O'Leary testified that Ms. Lewis got in contact with Joseph Lewis through Joseph Lewis' Facebook account. **Id. at p. 52, l. 1-9**. After Joseph Lewis liked the status that Ms. Lewis had posted, they started communicating through Messenger about meeting up and buying Vicodin. **Id. at p. 52, l. 10-16**. According to Ms. O'Leary, the plan was for Joe Lewis to meet her and Ms. Lewis in front of the house, come in and sell them ten Vicodin for a hundred dollars. **Id. at p. 53, l. 1-3**. During the Facebook conversation, Joe Lewis informed them he was bringing a friend but he did not identify who it was. **Id. at p. 53, l. 6-16**. At the time they were communicating with Joe Lewis, Ms. O'Leary, her two month old daughter and Ava Lewis were in the apartment. **Id. at p. 53, l. 17-24**. Once the two men arrived, Ms. O'Leary let them into the hallway and told them to go up the steps, because she was on the top floor. **Id. at p. 55, l. 17-24**. She testified that nothing was covering either of the two men's faces. **Id. at p. 56, l. 4-6**. Ms. O'Leary was

4

able to recognize Mr. Lewis when she saw him, but Defendant Mbewe had a hood on. **Id. at p. 56, l. 7-11**. Ms. O'Leary was able to identify the Defendant as the person who arrived with Mr. Lewis on the day of the robbery. **Id. at p. 56, l. 12-21**. Ms. O'Leary identified Defendant Mbewe in the courtroom as the person with Mr. Lewis. **Id**.

According to Ms. O'Leary, Loti/Defendant went up the stairs first, with Mr. Lewis right behind him, then Ms. Lewis and Ms. O'Leary last. **Id. at p. 57, l. 3-11.**When Ms. O'Leary walked into the apartment, Defendant was sitting down on a kitchen chair and Mr. Lewis was standing by the refrigerator. **Id. at l. 18-20**. Ms. Lewis was in the living room. **Id. at p. 58, l. 2-3**. Ms. O'Leary asked the men if they had the drugs to which they responded, "yes. They're the white ones. Ten milligrams." **Id.at l.4-9**. She asked them to show her the drugs, but they asked for the money first. **Id. at l. 14-15**. She then grabbed her money from her wallet which was on the couch in the living room. **Id. at l. 20-25**. As soon as she was ready to pull out the money, the Defendant was holding a gun about five feet from her face. **Id. at p. 59, l. 10-17**. Mr. Lewis said "just give me the money." **Id. at l. 23-24**. Ms. O'Leary gave Mr. Lewis the money because her daughter was in the living room sleeping and there was a gun involved. **Id. at p. 60, l. 2-7**. She was concerned she could be shot. **Id. at l. 8-9**. Mr. Lewis took the money and put it in his pocket, and at the same time, Ms. Lewis started to come into the kitchen until she saw the gun. **Id. at l. 10-18**.

The court then questioned the witness, "do you have any indication or knowledge as to whether the Lewis' were related?" to which she replied, "As far as I know, they aren't." **Id. at l. 21-25**. Ms. O'Leary further explained that her cell phone and some prescription that were in her bag were also taken by Mr. Lewis

5

while the Defendant held the gun on Ms. Lewis to take her phone and money. **Id. at p. 61, l. 6-15**. Ms. O'Leary had over $400 taken from her and $12 was taken from Ms. Lewis by the Defendant. **Id. at l. 16-25 through p. 62, l. 1**. Thereafter, Ms. Lewis began arguing with Mr. Lewis that she needed her phone because she was going to Maryland and Mr. Lewis said he would leave the phone on a porch up the street. **Id. at p. 62, l. 5-11**. Ms. O'Leary then told the men to get out, which they did after a few minutes. **Id. at l. 14-18**. Ms. Lewis waited about three minutes after the men left and went to the porch to look for her phone. **Id. at p. 64, l. 7-11**. When she returned about five minutes later, she was crying because she didn't have her phone. **Id. at l. 14-18**. Ms. O'Leary then told her she needed to call the cops, and she disagreed. **Id. at l. 19-20**. Ms. Lewis didn't want to call the police because she did not want to get in trouble with her dad. **Id. at p. 65, l. 4-7**.

Later that evening, after Ms. Lewis left, around 9 or 10 p.m. Ms. O'Leary decided to call the police. **Id. at l. 8-19**. The police came to her parent's house in Mount Washington. **Id. at p. 66, l. 1-5**. By the time Ms. O'Leary met with the police in Mount Washington, she believed she knew the names of both men involved in the robbery. **Id. at l. 17-21**. She told the police that she knew Joe Lewis was one of the men and that she believed the other was named Loti. **Id. at p. 67, l. 13-17**. She told the police they took her phone and money, but she was eventually able to track her phone and found it about two blocks away from her parent's house. **Id. at p. 68, l. 2-20**. She reported to the police that she was able to track and recover her phone. **Id. at p. 70, l. 10-15**.

Approximately one month after the robbery, Ms. O'Leary met with police officers to look at a series of photographs. **Id. at p. 70, l. 20-23**. She was shown

6

what the Commonwealth marked as Exhibits 1 and 2, which are each 10 page documents, including 8 photographs, the signature forms and the standard one sheet photo array. **Id. at p. 71, l. 8-12.** Exhibit No. 1 pertains to the identification of Mr. Lewis and Exhibit No. 2 pertains to the identification of Mr. Mbewe. **Id. at l. 14-16.** Ms. O'Leary quietly looked through the 10 page document marked Exhibit 1 and she recognized that all the faces sort of look like Mr. Lewis. **Id. at p. 72, l. 2-5.** She was able to point to the photograph of the one that she recognized was actually Mr. Lewis. **Id. at l. 6-8.** The photo she picked had her handwriting on the back where she wrote "Took money, a thousand percent positive that this was the guy in home robbery." **Id. at p. 72, l. 24 through p. 73, l. 1.** It was dated October 14, 2015 and she recognized her signature on the instruction page which is included in Exhibit 1. **Id. at p. 73, l. 6-21.** Upon a motion for admission by the Commonwealth, the court admitted Exhibit 1 into evidence. **Id. at p. 73, l. 23 through p. 74, l. 3.**

Ms. O'Leary was next asked to inspect what has been marked Exhibit 2. She looked at all 10 items and recognized pictures from the photo lineup to identify (Loti) Defendant. She admitted that there was her handwriting on the reverse side of No. 6, where she wrote, "Held gun in home robbery, 95 percent, my signature and 10/14/15." **Id. at p. 74, l. 13 through p. 75, l. 3.** Ms. O'Leary testified that the police officers never promised her anything if she agreed to pick out a certain photo; the officers never threatened her that she had to pick out one of the photos; and she personally picked out the photo of Loti because she remembered his face from the robbery. **Id. at p. 77, l. 6-19.**

7

On cross examination, Ms. O'Leary indicated she was told by Ms. Lewis' boy toy, named Tyler, the name Loti and she was shown a picture of him and she also looked up pictures on her own. **Id. at p. 91, l. 1-24**. Ms. O'Leary testified that the officer did not indicate to her that the person who robbed her was in one of the pictures. **Id. at p. 92, l. 22-24.**To the best of her recollection, the officer told her to take a look through the pictures to see if she recognized anyone from the home robbery. **Id. at p. 93, l. 1-3.**The officer told her it was okay if she couldn't identify anyone. **Id. at p. 93, l. 4-6**. Ms. O'Leary indicated that she gave the police a description of the Defendant before she looked at the photo array; she described him as African-American, approximately 5'8" in height, and wearing a hoodie; and she believed she provided the description during the second conversation she had with the police. **Id. at p. 93, l. 7-24.**

The Commonwealth called Officer Kalieb Hines to the stand. Officer Hines has been employed by the Pittsburgh Police Department for three and a half years. **Id. at p. 102, l. 12-16**. He was an officer with the Pittsburgh Police on September 12, 2015 and he was working late that afternoon and into the early evening. **Id. at p. 102, l. 17-23**. Officer Hines was asked to respond to a robbery call and drove to Stella Street to meet with Ms. O'Leary and her mother. **Id. at p. 103, l. 2-12**. Ms. Ava Lewis was not present at that time and Ms. O'Leary told him she wanted to report a robbery. **Id. at p. 103, l. 13-20**. She stated to the officer that "she was at her house located at 2223 Lutz Avenue with her fried Ava Lewis. She informed me that Ava Lewis contacted two males to come over to the house. When the two males arrived, she immediately identified one white male as Joe Lewis and a black male---she only knew him as Loti. She didn't have any last name. She could only describe him to me as a black male, approximately 19, 22,

8

maybe." **Id. at p. 103, l. 23 through p. 104, l. 6**. Ms. O'Leary further informed Officer Hines that Loti asked her if she had change and she stated no. **Id. at p. 104, l. 22-24**. At that time, she stated that Loti presented a pistol, which was black and silver, and told both females not to move. **Id. at p. 104, l. 24 through p. 105, l. 1**. Ms. O'Leary told the officer that Mr. Joe Lewis took $400 in cash out of her wallet and also a cell phone and left the residence. **Id. at p. 105, l. 2-5**.

Officer Hines indicated that Ms. O'Leary described Joe Lewis as a white male, approximately 19 years old, 5'4", about 130 pounds and she described the person she knew as Loti as a black male, approximately 19 to 21 years old, 120 pounds, approximately 5'7" and wearing a red hoodie sweatshirt. **Id. at p. 105, l. 12 through p. 106, l. 4**. Officer Hines testified that during his conversation with Ms. O'Leary there was no mention of a drug deal and he had no idea who were the two men that she described. **Id. at p. 106, l. 10-18**. During cross examination, Officer Hines stated it was approximately six hours from the time the robbery occurred to when he responded. **Id. at p. 107, l. 17-21**.

The Commonwealth's next witness was Sergeant Eric Baker. He is a sergeant with the Pittsburgh Police Department and was promoted to that position on March 24, 2016. **Id. at p. 109, l, 10-15**. He was a police officer for the City of Pittsburgh since September 28, 2009. **Id. at p. 109, l. 16-18**. Sergeant Baker was working as a police officer at the time of this incident in the fall of 2015. **Id. at p. 109, l. 19-21**. At that time, he was working in the group violence intervention unit at headquarters and he received an e-mail from Commander Karen Dixon, who asked if he saw this home invasion. **Id. at p. 110, l. 3-6**. According to the sergeant, group violence intervention investigated both nonfatal shootings and

9

home invasions within the City of Pittsburgh. **Id. at p. 110, l. 6-9**. Once he was made aware of the alleged robbery of Ms. O'Leary and Ms. Lewis, he read the report and contacted the victims. **Id. at p. 110, l. 10-13**. He met with the victims at police headquarters on October 14, 2015. **Id. at p. 110, l. 21 through p. 111, l. 7**. Ms. O'Leary's father was with her for the meeting. **Id. at p. 111, l. 14-15**. At the first meeting, Sergeant Baker very briefly went over the case and outlined where the investigation was going and how they were proceeding. **Id. at p. 111, l. 19-22**. During his second encounter with the victims, he chose to conduct a more in-depth interview because he felt he would get more direct answers from them without a parent being present. **Id. at p. 112, l. 3-11**. At the second interview the two women indicated that the robbery began as an attempted drug transaction. **Id. at p. 112, l. 23 through p. 113, l. 2**. Additionally, during the second encounter the woman described how the incident occurred, and it was largely consistent with what they testified to in court. **Id. at p. 113, l. 7-11**.

Towards the end of the second interview, Sergeant Baker made arrangements for two different photo arrays to be presented to both women. **Id. at p. 113, l. 13-25**. He agreed that the photo arrays were the ones shown to Ms. O'Leary in court as Commonwealth's Exhibits 1 and 2. **Id. at p. 114, l. 1-6**. Sergeant Baker identified the Defendant in court as the person whose image appeared in the photo array in Exhibit 2. **Id. at p. 114, l. 14-25**. When Sergeant Baker was asked how he was able to construct these two photo arrays before he met with the two women, he responded "Mr. Mbewe was already a defendant on a previously filed case of mine before I had left patrol and went to headquarters. Additionally, when I first saw that the suspects names were Joe and Loti, Joe was a white male, Loti was a black male, for a number of years I had worked the 3327

10

car, which is the Mount Washington car in Zone 3 station, and both these individuals were always up there. I was familiar with them, believed that they were probably the same people, and effectively just moved out on a hunch." **Id. at p. 115, l. 2-15.** He was also aware that Mr. Lewis had recently left Mount Washington and moved to the Carrick area not far from where this home invasion occurred. **Id. at p. 115, l. 21 through p. 116, l. 1.**

Sergeant Baker testified it was not his intention to personally present the photo array to the two women as that would be violating the policy with regard to photo arrays. **Id. at p. 116, l. 3-9.** He further explained that part of showing the photo array is that if you are the array creator or lead investigator of the case, you are not going to be present or be the one that shows that to the victims or witnesses. **Id. at p. 116, l. 17-20.** The reasoning is the person that shows the array should have no idea who the actual subject is, who the person of interest is in the investigation, as it can be overly suggestive if he would do it. **Id. at p. 116, l. 21-25.** It is also to avoid the possibility that you somehow might influence the victim or witness's decision even unconsciously. **Id. at p. 117, l. 1-5.** Therefore Sergeant Baker found an officer, Detective Chris Kertis, who did not know anything about the investigation to agree to present these two photo arrays to Ms. O'Leary and Ms. Lewis. **Id. at p. 117, l. 6-17.**

Sergeant Baker did not tell the two women anything about how they should conduct themselves during the photo presentation; he did not tell them they should pick someone out; and he did not promise them anything if they picked someone out. **Id. at p. 118, l. 13-22.**

11

On cross examination, Sergeant Baker admitted that when talking about his investigative hunch, it was effectively his belief that while preparing the photo array that Mr. Mbewe was the person involved in the robbery. **Id. at p. 129, l. 2-7.**

The Commonwealth's final witness as it pertains to the Suppression Motion was Detective Christopher Kertis. Detective Kertis has been a police officer for five and a half years and, has been a detective for the Pittsburgh Police for the past two years. **Id. at p. 131, l. 4-10.** He was working as a detective back on October 14, 2015 and he recalled that he was asked by Detective Eric Baker to present a photo array to two people. **Id. at p. 131, l. 11-20.** At that time, he knew nothing about the investigation into the alleged robbery of Elizabeth O'Leary and Ave Smith. **Id. at p. 131, l. 23 through p. 132, l. 5.** Detective Kertis inspected the two packets labeled as Exhibits 1 and 2 and he recognized them as the photo arrays he showed to the women, but not simultaneously, one at a time. **Id. at p. 132, l. 15 through p. 133, l. 10.** The detective showed the photo arrays to Ms. Lewis first. **Id. p. 133, l. 11-13.** She was not able to identify anyone. **Id. at l. 14-16.**

According to Detective Kertis, there is a standard City of Pittsburgh Police photo array instruction form that must be read before presentation of a photo array and it has to be signed by the lead detective, the person who shows the array and the witness who is being shown the array. **Id. at p. 133, l. 21 through p. 134, l. 8.** Detective Baker signed the form and asked Detective Kertis if he had time to show a couple of photo arrays, but there was no conversation about the photos themselves. **Id. at p. 134, l. 11-16.** Commonwealth Exhibit 1 was shown to Ms. O'Leary one photo at a time and she again looked through the photos one at a time, and she picked out photo No. 6, wrote a note, then signed and dated it. **Id.**

12

**p. 134, l. 22 through p. 135, l. 6**. When Ms. O'Leary was shown Commonwealth Exhibit No. 2, she was again identified one of the photos as being the actor. **Id. at p. 135, l. 7-11**. Detective Kertis explained that he tell a witness if they feel confident that they picked the right person, they should write in their own words what that person actually did or said. **Id. at p. 135, l. 15-18**. Ms. O'Leary signed and dated the photo and became upset when she was writing on the back. **Id. at p. 136, l. 1-3**. Detective Kertis asked her if she was alright, and she replied, yeah, "I just want him arrested for what he did. My kid was in the house." **Id. at l. 3-5**. Once again Detective Kertis testified he knew nothing of the case; he did not tell her she was required to identify a photo; and he did not say anything to her to the effect that she picked out a right person. **Id. at p. 136, l. 11 through p. 137, l. 11**.

At the conclusion of the Suppression Motion Hearing, this court denied the Motion. **Id. at p. 144, l. 10-11**. At that point, the Commonwealth indicated it was resting for purposes of the non-jury trial and the defense counsel stated he did not intend to call witnesses, but made a Motion for Judgment of Acquittal as to all charges. **Id at p. 144, l. 13-22**. This court, reviewing the evidence in the light most favorable to the Commonwealth, denied the Motion. **Id. at p. 145, l. 4-7**.

13

## DISCUSSION

## A

The Defendant's first alleged error on appeal is that the trial court erred in denying his pretrial motion for suppression of Ms. Ava Lewis and Ms. Elizabeth O'Leary's identifications of the Defendant through photo arrays, where the description of the assailant did not match Defendant's physical description, namely his height and weight. Defendant further submits that it was unduly suggestive for Detective Baker to have a photo array presented to the witnesses under those circumstances. This claim is fallacious.

The Pennsylvania Supreme Court has stated that the standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record, and whether the legal conclusions drawn from the facts are correct. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004).

The Pennsylvania Superior Court had held that they "may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts." *Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa. Super. 2008).

"Photographic identification of a person is unduly restrictive if, under the totality of the circumstances, the identification procedure creates a substantial

14

likelihood of misidentification." *Commonwealth v. Crork*, 966 A.2d 585, 588 (Pa. 2009). "Following a suggestive pre-trial identification, a witness will not be permitted to make an in court identification unless the prosecution establishes by clear and convincing evidence that the identification was not induced by events occurring between the time of the crime and the in court identification." *Commonwealth v. Rodgers*, 372 A.2d 771 (Pa. 1977). "When analyzing the admission of identification evidence, a suppression court must determine whether the challenged identification has sufficient *indicia* of reliability." *Commonwealth v. Sanders*, 42 A.3d 325, 330 (Pa. Super. 2012).

In determining whether an independent basis for identification exists, we must consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Commonwealth v. James*, 486 A.2d 376 (Pa. 1985). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." *McElrath v. Commonwealth*, 592 A.2d 740, 742 (Pa. Super. 1991).

In the instant matter, at the suppression hearing this court found that the photo arrays were not unduly suggestive and the witness had an independent basis for identification. Ms. Lewis was unable to make an identification of Defendant, but Ms. O'Leary clearly had sufficient time to observe the Defendant at the time of the crime. Once the two men arrived, Ms. O'Leary let them into the hallway and

15

told them to go up the steps, because she was on the top floor. **Id. at p. 55, l. 17-24**. She testified that nothing was covering either of the two men's faces. **Id. at p. 56, l. 4-6**. Ms. O'Leary was able to recognize Mr. Lewis when she saw him, but Defendant Mbewe had a hood on. **Id. at p. 56, l. 7-11**. Ms. O'Leary was able to identify the Defendant, the person who arrived with Mr. Lewis on the day of the robbery, in the courtroom as the one wearing the red jumpsuit. **Id. at p. 56, l. 12-21**.

According to Ms. O'Leary, Loti/Defendant went up the stairs first, with Mr. Lewis right behind him, then Ms. Lewis and Ms. O'Leary last. **Id. at p. 57, l. 3-11**.When Ms. O'Leary walked into the apartment, Defendant was sitting down on a kitchen chair and Mr. Lewis was standing by the refrigerator. **Id. at l. 18-20**. Ms. Lewis was in the living room. **Id. at p. 58, l. 2-3**. Ms. O'Leary asked the men if they had the drugs to which they responded, "yes. They're the white ones. Ten milligrams." **Id.at l.4-9**. She asked them to show her the drugs, but they asked for the money first. **Id. at l. 14-15**. She then grabbed her money from her wallet which was on the couch in the living room. **Id. at l. 20-25**. As soon as she was ready to pull out the money, the Defendant was holding a gun about five feet from her face. **Id. at p. 59, l. 10-17**. Mr. Lewis said "just give me the money." **Id. at l. 23-24**. Ms. O'Leary gave Mr. Lewis the money because her daughter was in the living room sleeping and there was a gun involved. **Id. at p. 60, l. 2-7**. She was concerned she could be shot. **Id. at l. 8-9**. Mr. Lewis took the money and put it in his pocket, and at the same time, Ms. Lewis started to come into the kitchen until she saw the gun. **Id. at l. 10-18**. Although Ms. O'Leary did not testify to the amount of time she was able to observe the Defendant during the crime, the

16

factual scenario she painted establishes she was with Defendant for a substantial period of time. She was face to face with him when he pointed the gun at her.

Ms. O'Leary was next asked to inspect what has been marked Exhibit 2. She looked at all 10 items and recognized pictures from the photo lineup to identify (Loti) Defendant. She admitted that there was her handwriting on the reverse side of No. 6, where she wrote, "Held gun in home robbery, 95 percent, my signature and 10/14/15." **Id. at p. 74, l. 13 through p. 75, l. 3**. Ms. O'Leary testified that the police officers never promised her anything if she agreed to pick out a certain photo; the officers never threatened her that she had to pick out one of the photos; and she personally picked out the photo of Loti because she remembered his face from the robbery. **Id. at p. 77, l. 6-19**.

Ms. O'Leary, who was in relatively close proximity to the Defendant, demonstrated a high degree of attention in the matter, as she was able to recount the Defendant's movements throughout the duration of the incident. The photo array did not create a substantial likelihood of misidentification. Ms. O'Leary displayed a high level of certainty in her identification to Detective Kertis. Ms. O'Leary's identification at the time of the array and at the suppression hearing was unequivocal and immediate. She positively identified the Defendant at each opportunity to do so. This court properly concluded Ms. O'Leary had an independent basis for her identification.

As such, this court believes its factual finding are supported by the record, no error in the legal conclusion was drawn therefrom, and Defendant's claim must fail.

**B**

17

The Defendant's second alleged error on appeal is that the trial court reached a verdict that was contrary to the weight of the evidence. He claims neither witness was able to identify the Defendant based upon their own independent recollections of the event. However, this assertion offers Defendant no greater refuge than his prior claim. In essence, it is the exact same claim as the first alleged error and this court need not address it any further.

Next, Defendant claims that Detective Baker testified that the description of the actor provided by the witness did not match the physical description of the Defendant, but the Detective included the Defendant's photo in the array due to the use of the name "Loti."

Finally, Defendant assets that the victims of this robbery waited a substantial period of time before reporting this incident.

The determination of whether a verdict is against the weight of the evidence is governed by the following standard:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may

18

only reserve the lower court's verdict if it so contrary to
the evidence as to shock one's sense of justice.

*Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003).

With respect to a weight challenge based on the credibility of witness
testimony, the Superior Court has held:

> "When the challenge to the weight of the evidence is
> predicated on the credibility of trial testimony, our review of
> the trial court's decision is extremely limited. Generally,
> unless the evidence is so unreliable and/or contradictory as
> to make any verdict based thereon pure conjecture, these
> types of claims are not cognizable on appellate review.
> Moreover, where the trial court has ruled on the weight claim
> below, an appellate court's rule is not to consider the
> underlying question of whether the verdict is against the
> weight of the evidence. Rather, appellate review is limited to
> whether the trial court culpably abused its discretion in ruling
> on a weight claim."

*Commonwealth v. Trippert*, 932 A.2d 188, 198 (Pa. Super. 2007), *quoting*
*Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004).

Further, a challenge to the weight of the evidence concedes that sufficient
evidence exists to sustain the verdict, but questions which evidence is to be
believed. *Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. 2006). A new
trial should not be granted because of a mere conflict in the testimony or because
the judge on the same facts would have arrived at a different conclusion.
*Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000). When a defendant claims

19

that a verdict is against the weight of the evidence, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the other facts, is to deny justice. *Commonwealth v. Fisher*, 47 A.3d a55, 158 (Pa. Super. 2012) *appeal denied*, 62 A.3d 378 (Pa. 2013).

This Court's finding that Ms. O'Leary was a credible witness is supported by the evidence of record, as fully set forth above in Discussion A. With regard to the claim the Detective Baker should not have included the Defendant's photo in the array, he fully explained:  Towards the end of the second interview, Sergeant Baker made arrangements for two different photo arrays to be presented to both women. **Id. at p. 113, l. 13-25**. He agreed that the photo arrays were the ones shown to Ms. O'Leary in court as Commonwealth's Exhibits 1 and **2. Id. at p. 114, l. 1-6**. Sergeant Baker identified the Defendant in court as the person whose image appeared in the photo array in Exhibit 2. **Id. at p. 114, l. 14-25**. When Sergeant Baker was asked how he was able to construct these two photo arrays before he met with the two women, he responded "Mr. Mbewe was already a defendant on a previously filed case of mine before I had left patrol and went to headquarters. Additionally, when I first saw that the suspects names were Joe and Loti, Joe was a white male, Loti was a black male, for a number of years I had

20

worked the 3327 car, which is the Mount Washington car in Zone 3 station, and both these individuals were always up there. I was familiar with them, believed that they were probably the same people, and effectively just moved out on a hunch." **Id. at p. 115, l. 2-15.** He was also aware that Mr. Lewis had recently left Mount Washington and moved to the Carrick area not far from where this home invasion occurred. **Id. at p. 115, l. 21 through p. 116, l. 1.**

Finally, Ms. O'Leary did not wait a substantial time before reporting the robbery, In fact, she called the police that very same evening after Ms. Lewis left her apartment. The fact that she initially chose not to mention the drug transaction has no bearing on the fact a robbery did occur.

For the foregoing reasons, this court did not abuse its discretion in denying Defendant's Motion for a New Trial on the grounds the verdict was against the weight of the evidence. The verdict was not contrary to the weight of the evidence and the conviction should stand.

## CONCLUSION

Based on the foregoing, the judgment of sentence imposed by this Court should be **AFFIRMED.**

BY THE COURT:

Date: 6/25/2018 _____, J.

PHILIP A. IGNELZI