J-S54032-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHARLES E. WILLIAMS | : | |
| | : | |
| Appellant | : | No. 793 MDA 2020 |

Appeal from the Judgment of Sentence Entered January 8, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004155-2018

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED APRIL 22, 2021**

Charles E. Williams ("Williams") appeals from the judgment of sentence imposed following his conviction of first-degree murder, criminal attempt, and possession of firearm prohibited.[1]  We affirm.

On March 23, 2018, at approximately 11:50 p.m., Tyrell Brown ("Brown"), drove himself, Joseph Williams ("Joseph"), and Williams to Double D's Bar, located on 19th Street in Harrisburg, Dauphin County, Pennsylvania. The trio entered Double D's Bar and began drinking.  At some point, Williams asked Brown for the keys to the car, and exited Double D's Bar.  Joseph and Brown subsequently exited the bar as well.  Shortly thereafter, Joseph saw an

---

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 6105(a)(1).

individual, later identified as Williams, fire a gun into a vehicle. The vehicle, belonging to Jawan Washington ("Washington"), was parked on the western side of Double D's Bar's parking lot.[2] Washington and Deion Shumate ("Shumate") were both inside of Washington's vehicle at the time of the shooting. After being shot, Washington exited his vehicle and attempted to flee, but collapsed nearby. Likewise, Shumate attempted to flee, but collapsed at the rear of Washington's vehicle, where he was shot again. An unknown bar patron drove Washington to Harrisburg Hospital, where Washington later died. Brown only heard the shooting, as his back was turned. Joseph and Brown subsequently left the scene together without Williams.

Police officers and emergency personnel responded to the scene. Emergency personnel transported Shumate to the Hershey Medical Center, where he remained, in a coma, until mid-April.[3] As a result of the shooting, Shumate suffered twelve gunshot wounds, was paralyzed, and had poor memory of the event.

Harrisburg Bureau of Police Officer Michael Maurer ("Officer Maurer") documented the crime scene. Officer Maurer collected thirteen .40 caliber cartridge casings, all from the same unknown firearm, plus additional evidence. Additionally, a bullet jacket and two bullet cores were recovered

---

[2] We note that the parking lot wraps around Double D's Bar on the north, west, and south.

[3] Washington had been taken to the hospital before police arrived.

from the autopsy of Washington.  Officer Maurer observed four bullet holes in the front windshield of Washington's vehicle.  Officer Maurer also collected a live .380 round from under the front passenger seat of Washington's vehicle.

Police investigators obtained multiple surveillance videos from Double D's Bar from the night of the shooting.  The Commonwealth hired Grant Fredericks ("Fredericks"), an expert in forensic video analysis, to identify an individual involved in the shooting, and to track that individual's location throughout the video recordings.  Fredericks identified three individuals as Male #1, Male #2, and Male #3.  Fredericks identified Male #1 as the "shooter," and utilized a process called "pixel tracking,"[4] as well as an "arrow"[5] to track Male #1 throughout the videos.  Fredericks observed that Males #1, #2, and #3, entered Double D's Bar together, but Male #1 later separated from Males #2 and #3.  The video depicted Male #1 exiting Double D's Bar and pacing back and forth between two vehicles.  Male #1 was then shown holding a firearm, raising his arm, and firing multiple rounds into one of the vehicles.  Immediately after the shooting, the video depicted two individuals, later identified as Shumate and Washington, attempting to flee from the vehicle.  The video showed Washington exiting his vehicle and attempting to

_____

[4] As discussed *infra*, Fredericks explained pixel tracking as the process he uses when tracking an object or an individual throughout synchronized, or compiled, surveillance videos.

[5] Fredericks placed the arrow over Male #1's head to aid in tracking Male #1 throughout the video.

flee to the rear of the bar, before collapsing near 19th Street. Shumate is shown attempting to flee, but collapsing at the rear of the parked car. The video then depicted Male #1 standing over Shumate and shooting Shumate again.

Wayne Ross, M.D., a forensic pathologist in the Dauphin County Coroner's Office, determined that Washington died as a result of three gunshot wounds to the back, chest, and abdomen.

On March 27, 2018, Williams was charged with homicide and related offenses. On August 9, 2019, Williams filed an Omnibus Pre-trial Motion, which included, *inter alia*, a Motion in *limine* seeking to preclude introduction of Fredericks's expert testimony. Williams argued that Fredericks's testimony was improper demonstrative evidence pursuant to Pa.R.E. 702, and that Fredericks should not be permitted to bolster the video surveillance footage with his expert opinion. In particular, Williams argued that Fredericks should not be permitted to offer his expert opinion identifying Williams in the surveillance video. On October 10, 2018, the trial court conducted a hearing on Williams's Omnibus Pre-trial Motion.[6] At the close of the hearing, the trial court denied Williams's Motion.

_____

[6] We note that the trial court heard testimony and argument, and addressed all of Williams's pre-trial claims at the "Suppression Hearing." *See* N.T. (Suppression Hearing), 10/10/19, at 3 (wherein the trial court stated that it would address all three issues in the Omnibus Pre-Trial Motion during the suppression hearing).

On January 6, 2020, Williams proceeded to a bifurcated jury trial. On January 8, 2020, the jury found Williams guilty of first-degree murder and criminal attempt. After the verdict was recorded, the jury reconvened, and found Williams guilty of possession of firearm prohibited.[7]

The trial court sentenced Williams to a period of life in prison for the first-degree murder conviction. For the remaining convictions, the trial court sentenced Williams to an aggregate term of 5 to 10 years in prison. The trial court directed the sentences to run consecutively. Additionally, Williams was ordered to pay the costs of prosecution and $2,000.00 in restitution to the Victim Compensation Board.

On January 10, 2020, Williams filed a post-sentence Motion, challenging, *inter alia*, the weight of the evidence. On the same date, the Commonwealth also filed a post-sentence Motion, seeking to amend the amount of restitution imposed from $2,000.00 to $7,029.34.

On February 27, 2020, the trial court denied Williams's post-sentence Motion. Additionally, the trial court conducted a hearing on the Commonwealth's post-sentence Motion on May 8, 2020, after which the trial

---

[7] The Commonwealth introduced evidence that Williams had a prior conviction for possession with intent to deliver, 35 P.S. § 780-113(a)(30), which prohibited him from lawfully possessing a firearm. **See** Commonwealth Exhibit 30, at 4; **see also** N.T. (Jury Trial), 1/6-8/20, at 318 (wherein Commonwealth Exhibit 30 was admitted into evidence)

court entered an Order increasing the amount of restitution from $2,000.00 to $6,500.00. Williams filed a Notice of Appeal on May 28, 2020.[8]

Prior to addressing Williams's claims on appeal, we must first determine whether Williams's Notice of Appeal was timely filed. *See Commonwealth v. Patterson*, 940 A.2d 493, 497 (Pa. Super. 2007) (stating that this Court has no jurisdiction over an untimely appeal). Generally, a notice of appeal must "be filed within 30 days after the entry of the order from which the appeal is taken." Pa.R.A.P. 903(a). If a defendant files a timely post-sentence motion, the notice of appeal shall be filed within 30 days of the entry of the order deciding the motion. Pa.R.Crim.P. 720(A)(2)(a); *see also Commonwealth v. Borrerro*, 692 A.2d 158, 161 (Pa. Super. 1997) (stating that "a judgment of sentence does not become final until post-sentence motions are ruled upon by the trial court or are denied by operation of law."). Additionally, "[i]f the Commonwealth files a timely motion to modify sentence pursuant to [Pa.R.Crim.P.] 721, the defendant's notice of appeal shall be filed within 30 days of the order disposing of the Commonwealth's motion." Pa.R.Crim.P. 720(A)(4); Pa.R.Crim.P. 721(c)(1) (providing that when both the

_____

[8] Williams purports to appeal from the February 27, 2020, Order denying his post-sentence Motion as well as the May 8, 2020, Order granting the Commonwealth's post-sentence Motion and increasing the restitution amount; however, the appeal properly lies from the judgment of sentence imposed on January 8, 2020. *See Commonwealth v. Shamberger*, 788 A.2d 408, 410 n.2 (Pa. Super. 2011) (*en banc*) (stating that an appeal in a criminal matter properly lies from the judgment of sentence imposed, not the date post-sentence motions were decided).

defendant and the Commonwealth file post-sentence motions, "[t]he [Pa.R.Crim.P.] 720(B)(3) time limits for deciding the defendant's post-sentence motion, including the automatic denial provisions, shall apply to the disposition of the Commonwealth's motion.").

Instantly, both Williams and the Commonwealth filed their timely post-sentence Motions on January 10, 2020. The trial court denied Williams's post-sentence Motion on February 27, 2020, and granted the Commonwealth's Motion on May 8, 2020.[9] Thus, Williams's judgment of sentence did not become final, for the purposes of appeal, until May 8, 2020. Accordingly,

_____

[9] On March 16, 2020, the Pennsylvania Supreme Court declared "a general, statewide judicial emergency until April 14, 2020, on account of COVID-19." Supreme Court of Pennsylvania No. 531 Judicial Administration Docket, Order, 3/16/20, at 1; *see also id.* at 2 (authorizing president judges in individual districts to, *inter alia*, "suspend time calculations for the purposes of time computation relevant to court cases … as well as time deadlines[.]").

Pursuant to the Supreme Court's March 16, 2020, Order, the President Judge of the Dauphin County Court of Common Pleas declared a judicial emergency on March 16, 2020, and suspended time calculations. *See* 12th Judicial District – Declaration of Judicial Emergency, 3/16/20, at 1; *see also* 12th Judicial District Administrative Order (AO-12-2020), 3/17/20, at 3 (suspending "[t]ime calculations for the purposes of time computation relevant to court cases or other judicial business[.]"); 12th Judicial District – Second Declaration of Judicial Emergency, 4/23/20, at 1 (extending the judicial emergency until May 31, 2020).

Williams's Notice of Appeal, filed on May 28, 2020, is timely.[10]  Additionally,

Williams filed a timely court-ordered Pa.R.A.P. 1925(b) Concise Statement of

errors complained of on appeal.

Williams now raises the following issues for our review:

1. Did the trial court err whe[n] it denied [Williams's] [O]mnibus [P]re[-]trial Motion pursuant to *Frye v. U*[.]*S*[.][11] and Pennsylvania Rules of Evidence 403 and 702?

2. Did the trial court err in denying [Williams's] request for a cautionary eye witness instruction pursuant to *Commonwealth v. Kloiber*?[12]

3.  Was the evidence at trial insufficient to prove beyond a reasonable doubt that [Williams] committed the crime of homicide, attempted-homicide[,] and possession of firearm prohibited, where the Commonwealth failed to prove that [Williams] was the individual [who] fired the shots that killed [Washington] and injured [Shumate], and where no Commonwealth witnesses testified that he/she saw [Williams] with a firearm, knew him to have a firearm with him that evening, or saw [Williams] fire shots at [Washington and Shumate]?

4. Did the trial court err in denying [Williams's] post[-]sentence Motion requesting an arrest of judgment and seeking a new trial,

---

[10] In any event, we could consider the trial court's failure to decide both Williams's and the Commonwealth's Motions *simultaneously* to constitute a breakdown in the courts.  *See* Pa.R.Crim.P. 721(C)(1) (providing that when both the defendant and the Commonwealth filed post-sentence Motions, the trial court "*shall* decide the Commonwealth's motion and the defendant's post-sentence motion *simultaneously*.").  Accordingly, Williams's Notice of Appeal would be timely on this basis as well.  *See Patterson*, 940 A.2d at 498 (stating that "[n]onetheless, this general rule does not affect the power of the courts to grant relief in the case of fraud or breakdown of the processes of the court.").

[11] *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[12] *See Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954).

where the verdict for the charges of homicide, attempted-homicide, and possession of firearm prohibited were so contrary to the weight of the evidence that it shocks one's sense of justice, where the testimony presented by the Commonwealth's witnesses was inconsistent, and where no witness testified that they observed [Williams] with a firearm, knew him to have a firearm with him the evening of the shooting, or saw [Williams] fire shots at [Washington and Shumate]?

Brief for Appellant at 9-10 (footnotes added; some capitalization omitted).

Williams raises two distinct claims in his first argument, which we will address separately. First, Williams claims that the trial court abused its discretion when it denied his Omnibus Pre-trial Motion, which challenged the admissibility of Fredericks's expert testimony regarding his forensic video analysis. *Id.* at 19. Williams argues that, pursuant to Pa.R.E. 702, Fredericks's testimony and alteration of the surveillance images should have been precluded, as it intruded into the factfinder's domain. *Id.* at 19-22. Williams acknowledges that Fredericks's "compiling and synchronization of the images was within the permissible limits" of expert testimony. *Id.* at 22-23. However, Williams asserts that Fredericks's testimony surpassed "allowable" expert testimony by adding an "arrow" to the surveillance video and images, for the purpose of tracking "Male #1," throughout the video. *Id.* Fredericks further identified "Male #1" as the "shooter." *Id.* Williams claims that by identifying the shooter with an added arrow symbol in the surveillance video and images, Fredericks effectively identified Williams as the shooter. *Id.* at 22-25.

[I]n cases involving the admission of expert testimony … the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion. An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice.

***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa. Super. 2013) (citation omitted).

Pennsylvania Rule of Evidence 702 provides as follows:

**Rule 702.  Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702(a)-(c).

Our review discloses that, at the suppression hearing, Fredericks, a certified forensic video analyst, testified that he was retained by the Commonwealth to synchronize Double D's Bar's surveillance videos, and track

three individuals[13] through the videos. N.T. (Suppression Hearing), 10/10/19, at 5, 16-17.

Fredericks explained that when he analyzed Double D's Bar's videos, he utilized a technique called pixel tracking, which allowed him to accurately track Male #1 throughout the videos. N.T. (Suppression Hearing), 10/10/19, at 25-56. However, Fredericks stated that in order to accurately track an individual via pixel tracking, he must first consider several technical variables. *Id.*

Fredericks explained the first of these technical variables, Moving Pictures Experts Group ("MPEG"), as having "hundreds of different partitions and levels that all change the way video is encoded," which can result in repeated data. *Id.* at 18. According to Fredericks,

> there are a number of features that I've articulated in my report that I considered – there's quite a few of them that I considered that in my experience and training are not something that a layperson would understand without assistance and may, in fact, misinterpret the images based solely on the misunderstanding of how MPEG video works.
>
> MPEG video's not intended to accurately reproduce everything perfectly. It's intended to encode images in a surveillance environment to the best of its ability given the limitations of light and motion.

---

[13] As noted above, throughout his expert report and his testimony, Fredericks refers to these individuals as Male #1, Male #2, and Male #3. Commonwealth Exhibit 3 (Expert Report), at 1-20.; N.T. (Suppression Hearing), 10/10/19, at 17 (wherein Commonwealth Exhibit 3, was admitted into evidence at the suppression hearing).

*Id.* at 18-20. Fredericks further explained that MPEGs "reuse[] information, and sometimes that has the effect of making it look like the individual did not move when, in fact, there might have been some movement, but it didn't meet the threshold for movement[,] so it was predicted." *Id.* at 25.

Next, Fredericks explained that the cameras at Double D's Bar employ a "charged-coupled device [("CCD")], which is a source of light." *Id.* at 22. Fredericks explained that CCDs can lead to two technical variables, clipping and oversaturation, which cause bright objects to appear larger. *Id.* at 21. *Id.* at 22. Fredericks testified that the camera's sensor alters how an object is depicted in the video, so that "dark objects next to light objects will be quite different in their reality." *Id.*

Fredericks then explained that the Double D's Bar surveillance system utilized infrared illumination, and explained the issues relating to color values affected by infrared illumination, stating that, "when we're watching video of somebody walking from one camera viewed under infrared influence into another camera without that influence, **it will look like a completely different individual based on the clothing appearance alone**." *Id.* at 20 (emphasis added). Fredericks then utilized examples from the surveillance footage to demonstrate how an individual may appear differently in an infrared influenced camera, versus a non-infrared influenced camera. *Id.* at 31-32. Further, Fredericks utilized "control examples" in order to demonstrate the influence infrared can have on an object. *Id.* at 32-33.

Fredericks explained that Double D's Bar's surveillance video switched between color to infrared influencing due to the built-in sensors in both the interior and exterior cameras. *Id.* at 37-38. This resulted in the above-described color-swapping between cameras. *Id.* at 37-39.

Next, Fredericks explained that lens distortion is caused by fisheye lenses, which are lenses designed to capture a wider view. *Id.* at 23. Fisheye lenses present two distinct drawbacks relating to an object's location as well as the object's shape. *Id.* As Fredericks explained, the curvature of a fisheye lens distorts the outer edges of the view, "which may make an individual look like their arm is moving in a way that it's not moving or [that] their body is shaped differently." *Id.*; *see also id.* (wherein Fredericks states that "motion … on the outside of the lens … may appear to be slower, shorter, than it is in reality.").

Next, Fredericks also explained that different cameras had different "image capture rates." *Id.* at 23. That meant that one camera would capture more images than another, which could lead to an object appearing in one camera that did not appear in another until several frames later. *Id.* at 23-24.

Additionally, Fredericks testified about the aspect ratio issues,

> [t]he result is that objects depicted within the images of the original data will appear stretched. **So**[**,**] **an individual will appear stockier, shorter, heavier than they are in reality. A vehicle will appear longer.** And that may cause individuals to look at an object, a questioned object and a

known object, and see that distortion and go, "[] they can't be the same," if they don't understand the distortion.

*Id.* at 24 (emphasis added).

Finally, Fredericks stated that after *all* of the above technical variables had been considered, he utilized the technique called pixel tracking. *Id.* at 27. Fredericks explained that pixel tracking is the process he uses when tracking an object or an individual throughout synchronized, or compiled, surveillance videos. *Id.* at 25. Fredericks testified as follows:

> [P]ixel tracking is a method that is used by my industry to track the motions of either vehicles, individuals, or even arm and leg movements.
>
> … When we have these issues, like infrared, going from a colored image to a black-and-white under infrared influence, if we don't track the pixels that make up, say, the top of the head or something, **a person not familiar with that will think that the individual is not the same person when**, **in fact**, **it's just under infrared**.
>
> * * *
>
> … I have specialized tools that allow me to magnify an image where I'm tracking the motion of the top of the head that might be intermingled with a group of people, and it's – I can't look at it with my eyes and track the individual. **Even with my experience**, **I can't simply eyeball it and make that tracking**. **I have to use specialized tools and carefully track and validate that tracking**.
>
> … To assist me, **I put an arrow on top of the object or individual that I'm tracking**. If I don't put that arrow on there, I'll lose track of that individual. That arrow then stays on that pixel and the group of pixels that make up the individual, and at any given time I can fast forward, rewind, and my arrow stays on that individual so I know that I'm tracking the same person.

> [T]hen I validate that by going to different areas within the image where they're more clear to see that I'm still on the right person. And then[,] as that individual gets lost in a crowd, I [] have to magnify and make sure that I have not lost continuity of the individual.
>
> * * *
>
> The **accumulation of all of those issues** allowed me to accurately conduct my work. **If I hadn't considered th**[**em**]**, I wouldn't be able to confidently say that I can accurately track an individual or do the analysis I've done**.

*Id.* at 25-27 (emphasis added). Fredericks testified that he uses the arrow[14] to ensure continuity of an individual even though different video recordings, for example an infrared camera, may show what appears to be a different person. *Id.* at 42. In total, Fredericks put together images from sixteen different cameras at Double D's Bar. *Id.* at 42-43.

In his expert report, Fredericks made the following findings to a reasonable degree of professional certainty:

[1] Male #1 is uniquely dressed, and that no other person is dressed in a similar manner as Male #1.

[2] Each of the cameras share the same linear on-screen time stamp reference and synchronized action captured to two or more cameras validates the time stamp synchronization.

[3] Male #1 is reliably tracked through each of the depicted camera views.

---

[14] Fredericks explained that, in order to utilize the arrow with pixel tracking, he tracks the movements of the top of the head of Male #1 by "keyframes." N.T. (Suppression Hearing), 10/10/19, at 34-35. Fredericks continued, "as the individual moves forward, a keyframe is added [and] [t]hat locks the arrow to the pixels that make up that individual." *Id.* at 35.

[4] Male #1 is the shooter.

[5] No opinion as to the actual identification of Male #1.

Commonwealth's Exhibit 3, Expert Report, at 20; N.T. (Jury Trial), 1/6-8/20, at 247 (wherein Commonwealth Exhibit 3 was entered into evidence at the jury trial).

At the suppression hearing, the trial court denied Williams's challenge to Fredericks's testimony, stating as follows:

> [A]s I follow it, [Fredericks is] not rendering any opinion on identification. He's simply analyzing 16 cameras, tracking them, using a pixel identification so that an individual can be tracked despite the distortions from -- whether it's the buffering, to the infrared, to all the other matters, and simply allows the jury to follow the video. Ultimately, they decide who that individual in the video is.
>
> * * *
>
> [I]t overcomes the technological limitations of the camera technology and our monitor technology. And the ability then, based upon the different timing of frames per second with the various cameras, his explanation clearly makes it easier for the jury to understand.
>
> And the reason I'm saying that, what's unusual about this case is, I was a -- well, actually watched the preliminary hearing as the issuing authority. … I remember having mental [*sic*] note, like, why is the clothing changing colors and [] I had no idea about infrared filters or anything else….
>
> There's no question in my mind that [Fredericks's] testimony assists the fact finder in understanding the video's limitations and interpreting those limitations to give continuity not only by the digital code … but the fact there's a differential.
>
> So, I'm really leaning toward the fact that absent that, the jury's more **apt to be misled by those technological**

> **limitations**.  And I don't see the prejudice as long as he doesn't render an opinion as to who the person in the video is.  That[ will] still come down to the identification of the primary witnesses.

N.T. (Suppression Hearing), 10/10/19, at 54-55 (emphasis added).

Our review of the record reveals that the trial court did not abuse its discretion in admitting Fredericks's expert testimony.  Here, Fredericks testified that an untrained person would have difficulty tracking the pixels from the video with the naked eye.  ***See id.*** at 25; ***see also id.*** at 54-55; Trial Court Opinion, 7/21/20, at 19.  Our review confirms that Fredericks described the technical terminology, demonstrated how it was applied, and described how he was able to utilize pixel tracking to track the individual designated as Male #1.  N.T. (Suppression Hearing), 10/10/19, at 18-21, 23-26, 31-32, 34-35, 37-39, 42-43, 45-47, 51; ***see also Commonwealth v. Walker***, 92 A.3d 766, 780 (Pa. 2014) (stating that "expert testimony must be beyond the knowledge possessed by a layperson and assist the trier of fact to understand the evidence or determine a fact in issue.").

Moreover, Fredericks did not identify Williams as Male #1.  Indeed, Fredericks did not identify Male #1 at all.  ***See*** Commonwealth Exhibit 3 (Expert Report), at 20.  Instead, the record confirms that Fredericks included the arrow and designated Male #1 simply to allow the fact-finder to track the same individual throughout different surveillance videos. N.T. (Jury Trial), 1/6-8/20, at 233-46 (wherein Fredericks explained the technical limitations of the video and demonstrated how Male #1's appearance would change through

- 17 -

various cameras, but did not offer any opinion as to the identity of the shooter). Thus, Fredericks's testimony did not "invade" the realm of the jury, but rather, Fredericks aided the jury in understanding the surveillance video in order for the jury to determine the identification of the shooter. **See Huggins**, **supra**; **see also Walker**, **supra**. Accordingly, we cannot grant Williams relief on this claim.

Next, Williams contends that Fredericks's expert testimony should not have been admitted, because it was unfairly prejudicial pursuant to Pa.R.E. 403. Brief for Appellant at 26. Williams argues that the arrow Fredericks added to the surveillance footage created unfair prejudice, because it led "to the 'identification' of [Williams], [by] distinguishing one individual from the other individuals shown in the images and insinuating the distinguished individual was the shooter." **Id.** at 27-28. Williams claims that Fredericks's expert testimony, particularly the addition of the arrow above Male #1's head, was too prejudicial to outweigh its probative value, because "no witness testimony identif[ied] the shooter[,] indicat[ed] that [Williams] carried a firearm [on] the night of the incident, or observ[ed] [Williams] in possession of a firearm on the night of the incident." **Id.** at 28.

"Relevance is the threshold for admissibility of evidence." **Commonwealth v. Talbert**, 129 A.3d 536, 539 (Pa. Super. 2015) (citation omitted). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports

a reasonable inference or presumption regarding the existence of a material fact." ***Commonwealth v. Antidormi***, 84 A.3d 736, 745 (Pa. Super. 2014); ***see also*** Pa.R.E. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[,] and [] the fact is of consequence in determining the action.").

Further, Pennsylvania Rule of Evidence 403 provides, in relevant part, as follows:

> **Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**
>
> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.
>
> *Comment*:
>
> * * *
>
> "Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

Pa.R.E. 403.

"Evidence is not unfairly prejudicial simply because it is harmful to the defendant's case." ***Commonwealth v. Page***, 965 A.2d 1212, 1220 (Pa. Super. 2009) (quotation omitted). The trial court is not required to "sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand." ***Id.*** Exclusion of evidence on the grounds that it is prejudicial is "limited to evidence so prejudicial that it

- 19 -

would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." ***Commonwealth v. Foley***, 38 A.3d 882, 891 (Pa. Super. 2012).

As detailed above, at the suppression hearing, the trial court heard lengthy testimony about the various technical limitations of Double D's Bar's surveillance system, and the difficulty a layperson would have in understanding the video, lighting, size, color, and other changes between the cameras. ***See*** N.T. (Suppression Hearing), 10/10/19, at 18-21, 23-26, 31-32, 34-35, 37-39, 42-43, 45-47, 51. The trial court determined that the probative value of Fredericks's expert opinion and testimony outweighed its prejudicial impact. N.T. (Suppression Hearing), 10/10/19, at 54-55. Specifically, the trial court reasoned that without Fredericks's expert testimony, "the jury [is] more apt to be misled by [] technological limitations." ***Id.*** at 55. Further, the trial court concluded that "as long as [Fredericks] doesn't render an opinion as to who [Male #1 is]" then there is no prejudice. ***Id.*** The trial court reasoned that the jury would be able to view the videos, as well as Williams in the courtroom, and hear witness testimony as to Male #1's identity. ***Id.***

Upon review, we discern no abuse of discretion on the part of the trial court in reaching its conclusion. Significantly, Fredericks did not identify Male #1, nor did Fredericks offer any opinions as to Male #1's identity. ***See*** Commonwealth Exhibit 3 (Expert Report) at 20; ***see also*** N.T. (Jury Trial),

1/6-8/20, at 233-46. Importantly, the determination as to Male #1's, and consequently the shooter's, identity was left entirely in the realm of the jury. Further, the probative value of Fredericks's testimony, coupled with the added arrow and pixel tracking, outweighed any inflammatory potential. *See Commonwealth v. Serge*, 896 A.2d 1170, 1182 (Pa. 2006) (stating that "even inflammatory evidence may be admissible if it is relevant and helpful to a jury's understanding of the facts and the probative value outweighs the prejudicial effect.") (citation omitted). Thus, Fredericks's use of an arrow to signify Male #1, did not cause unfair prejudice, rather was properly admitted by the trial court in order to assist the jury in interpreting, and understanding, Double D's Bar surveillance videos. *See Walker*, *supra*; *see also Page*, *supra*.

In his second claim, Williams contends that the trial court abused its discretion when it denied his request for a jury instruction pursuant to *Kloiber*.[15] Brief for Appellant at 28-30. Williams argues that no witness positively identified the shooter, or observed Williams with a firearm that evening. *Id.* at 30-31. Williams claims that he was entitled to a *Kloiber*

---

[15] "A *Kloiber* instruction informs the jury that an eyewitness identification should be viewed with caution when either the witness did not have the opportunity to view the defendant clearly, equivocated on the identification of the defendant, or has had difficulties identifying the defendant on prior occasions." *Commonwealth v. Sanders*, 42 A.3d 325, 332 (Pa. Super. 2012) (citation omitted).

instruction because neither Brown nor Joseph were able to see or identify the shooter. *Id.* at 31.

At the outset, we must address whether Williams has preserved this claim for our review. This Court has stated previously that,

> [i]n order to preserve a claim that a jury instruction was erroneously [omitted], the [a]ppellant must have objected to the charge at trial. Pa.R.A.P. 302(b) (providing that "[a] general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of."); Pa.R.Crim.P. 647(B) ([providing that] "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.")….
>
> **The pertinent rules, therefore, require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction**….

*Commonwealth v. Parker*, 104 A.3d 17, 29 (Pa. Super. 2014) (emphasis added; some citations omitted).

Instantly, Williams requested a *Kloiber* instruction in his proposed jury instructions. *See* Defendant's Proposed Points of Charge, 1/8/20, at 2-3 (unnumbered); *see also* Trial Court Opinion, 7/21/20, at 19. However, when it came time to charge the jury, the trial court omitted the requested *Kloiber* instruction. N.T. (Jury Trial), 1/6-8/20, at 281-306. Prior to sending the jury to deliberate, the trial court afforded both parties the opportunity to object to its jury instructions, and the following exchange occurred:

> [Trial Court]: Now we'll give an opportunity prior to the final closing instructions, is there anything else requested of the Commonwealth?

[Commonwealth]: No, Judge.

[Trial Court]: Or the defense?

[Defense Counsel]: No, Judge, Thank you.

N.T. (Jury Trial), 1/6-8/20, at 307. Because, Williams failed to object to the trial court's omission of a **Kloiber** instruction, he has waived this claim on appeal.[16] **See Parker**, **supra**.

In his third claim, Williams contends that the Commonwealth presented insufficient evidence to sustain his convictions of homicide, attempted homicide, and possession of firearm prohibited, because the Commonwealth failed establish his identity as the shooter. Brief for Appellant at 32. Williams asserts that none of the witnesses testified that they observed Williams with a firearm on the evening of the incident, or otherwise identified him as the shooter. **Id.** at 35-36.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test,

_____

[16] Moreover, as Williams acknowledges multiple times in his brief, none of the witnesses at trial identified Williams as the shooter. **See** N.T. (Jury Trial), 1/6-8/20, at 93-94, 112-13 (wherein Brown and Joseph both testified that they could not see the shooter, and could not identify Williams as the shooter); **see also** Brief for Appellant at 30-31, 35-36, 38. Because the witnesses provided no in-court identification of Williams as the shooter, a **Kloiber** instruction was not warranted. **See Sanders**, 42 A.3d at 335 (stating that a **Kloiber** instruction is not necessary where the witness declines to identify the defendant in court). Consequently, even if Williams had not waived this claim, we would conclude that it lacks merit.

we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

The Crimes Code, in relevant part, provides as follows:

**§ 2502. Murder**

**(a) Murder of the first degree.--**A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

\* \* \*

**(d) Definitions.--**As used in this section the following words and phrases shall have the meanings given to them in this subsection:

\* \* \*

**"Intentional Killing."** Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

18 Pa.C.S.A. § 2502(a), (d).

**§ 901. Criminal attempt**

**(a) Definition of attempt.--**A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

18 Pa.C.S.A. § 901(a).

**§ 6105. Persons not to possess, use, manufacture, control, sell or transfer firearms**

**(a) Offense defined.--**

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

**(b) Enumerated offenses.—**The following offenses shall apply to subsection(a):

18 Pa.C.S.A. § 6105(a)-(b).

"[E]vidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. Jones*, 954 A.2d 1194, 1197 (Pa. Super. 2008). Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be considered to establish identity in conjunction with other circumstances and identification testimony. *Commonwealth v. Minnis*, 458 A.2d 231, 233-34 (Pa. 1983).

Instantly, the Commonwealth presented Fredericks's expert testimony, wherein he labeled three men from the video surveillance as Male #1, Male

#2, and Male #3.[17] *Id.* at 230-33. Fredericks also indicated that Male #1, who was wearing a dark cap, dark sweatshirt with light-colored strings, dark shoes, and a reflective object on the right-hand side of the belt, was the shooter. *Id.* at 231-32. Fredericks did not make a determination as to Male #1's identity. *See id.* at 231-32; *see also* Commonwealth Exhibit 3 (Expert Report) at 20. Fredericks testified as to the technical limitations of the surveillance system, and described how he tracked Male #1 through the surveillance system, utilizing pixel tracking. N.T. (Jury Trial), 1/6-8/20, at 233-46. The video depicted Male #1 pacing between two vehicles. *Id.* at 243. Fredericks then explained that, as Male #1 approached one of the vehicle, Male #1 is depicted holding a gun-shaped object, raising his arm, and firing multiple rounds into the vehicle, and firing an additional round at one of the men who fell onto the ground. *Id.* at 243-44. From a different camera, Male #1 is then seen exiting the view of the cameras. *Id.* at 244-45.

The Commonwealth further presented the testimony of Joseph and Brown, who arrived at Double D's Bar with Williams. *Id.* at 85, 109-12. Joseph was shown the surveillance video depicting the trio entering Double D's Bar, and Joseph identified Williams on the video. *Id.* at 88-92. Brown

---

[17] We note, that in his testimony, Joseph identified himself as Male #2. *Id.* at 90. Further, that in his testimony, Brown identified himself as Male #3. *Id.* at 115.

was also shown the surveillance footage from the bar's entrance, and Brown identified Williams in the footage. *Id.* at 115-16.

The evidence, viewed in the light most favorable to the Commonwealth as the verdict-winner, was sufficient to establish Williams as the shooter. Both Joseph and Brown identified Williams entering Double D's Bar on the surveillance video, as the same man designated as Male #1. *See id.* at 88-92, 112-13, 233-46; *see also* Trial Court Opinion, 7/21/20, at 21-23 (noting that Male #1 was the same man that both Joseph and Brown identified as Williams). Thus, ample evidence existed for the jury to determine that Williams shot and killed Washington, attempted to kill Shumate, and possessed a firearm on March 24, 2018. *See* 18 Pa.C.S.A. §§ 2502(a), 901(a), 6105(a); *see also Smith*, *supra*. Therefore, the Commonwealth presented sufficient evidence to sustain Williams's convictions.

In his fourth claim, Williams contends that the verdicts were against the weight of the evidence. Brief for Appellant at 36-37. Williams argues that "[t]he lack of identification testimony demonstrates that undue weight was given to [] Fredericks's [] testimony, [because] no witness identified the shooter." *Id.* at 38. Williams claims that it "illogical and shocking" that he can be convicted of homicide, attempted homicide, and possession of firearm prohibited without being identified. *Id.*

> The law pertaining to weight of the evidence claims is well-settled. The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new

trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the fact, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015)

(quotation marks and citations omitted).

In its Opinion, the trial court addressed this claim as follows:

In the present case, the weight of the evidence supports the jury's findings. The entirety of the homicide is captured on video by Double D's surveillance system, albeit shown from a distance. However, the testimony of the witnesses, coupled with the surveillance videos, clearly indicate that [Williams] was the shooter. Both [Joseph] and [] Brown identified [Williams] in the surveillance video, as well as still photographs captured from said video. The individual identified as [Williams] is the same individual that [] Fredericks identifies as the shooter[, or Male #1,] from his analysis of the surveillance videos. The videos show [Williams] holding a firearm in his right hand, and moments later[,] firing said firearm at [Washington and Shumate].

Trial Court Opinion, 7/21/20, at 24-25.

Our review of the record confirms that the trial court did not abuse its discretion when it concluded that the jury's verdict was not against the weight of the evidence. *See Gonzalez*, *supra*. Moreover, this court will not reweigh evidence. *See Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (reiterating that it is not the position of this Court to "reweigh the

evidence or substitute our own judgment for that of the fact finder").

Discerning no abuse of discretion by the trial court, this claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/22/2021