J-S20022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY G. HARBST | : | |
| | : | |
| Appellant | : | No. 1595 MDA 2023 |

Appeal from the Judgment of Sentence Entered October 26, 2023
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000241-2022

BEFORE: OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.: **FILED: AUGUST 6, 2024**

Gary Harbst appeals from the judgment of sentence imposed after a jury found him guilty of multiple offenses arising from a fire he set to his son's house attempting to kill his wife of more than 60 years. He challenges the sufficiency of the evidence to sustain his convictions. Upon review, we affirm.

This matter arises from the following:

[O]n the morning of June 6, 2022, [Harbst] attempted to kill his wife, Bonnie Harbst, and intentionally destroyed the house and nearly all of the property owned by their son, Gary Harbst, Jr., by setting fire to Gary's house while Bonnie was still inside. He further attempted to prevent Bonnie from escaping the house fire by setting fire to Bonnie's car (which was parked near one of the exits) and firing shots from a .22 rifle toward the house. [Harbst] then fled the scene, giving Bonnie an opportunity to escape to safety. Gary's house, vehicles, and everything in them were a total loss.

---

[*] Former Justice specially assigned to the Superior Court.

Pennsylvania State police troopers responding to the incident located [Harbst] at his home (which he owned jointly with Bonnie) a short distance away from the scene. They took him into custody . . . .

The events of June 6, 2022, were the culmination of a series of events that began about three months earlier, in March, 2022. Up until that time, [Harbst] was widely known as a gentle, generous, family focused man. Family members described him as a pillar and bedrock of his family who rarely said an angry word and who spent significant amounts of time with his children, grandchildren, and great-grandchildren. Then 82 years old, [Harbst] had been married to Bonnie, then 80 years old, for sixty-two years. However, for unknown reasons, [Harbst's] feelings and demeanor toward his family took an about-face. He called a family meeting at which he told their-children and grandchildren that he was going to tell them the "truth" about Bonnie, and then accused her of having multiple affairs with other men over the years. His demeanor and the wild nature of his accusations so troubled the family that they believed him to be having some sort of mental health episode, and discussed having him involuntarily committed for mental health treatment . . . . [*i.e.*, "302'd"]. When they told him of this, he alternately threatened to kill whomever walked through the door and to commit suicide.

The family members left after attempting to [diffuse] the situation, but it only grew worse in the following weeks and months. Defendant threatened to commit suicide in front of Bonnie while putting a gun to his head, wanting her to "stand close" so that he could "blow his brains all over her." He began making wilder and ever more insulting allegations regarding Bonnie's sexual behavior, ultimately accusing her and Gary of having an ongoing oedipal affair. He sought to pit his children and grandchildren against Bonnie, growing ever more angry and outraged when they did not side with him.

Bonnie moved out of their house and began staying at Gary's house, though she maintained contact with [Harbst] and continued to help him with tasks such as buying groceries for him. Harbst made increasingly violent threats toward Bonnie, and this resulted in Bonnie obtaining a protection from abuse ["PFA"] order against him.

On the same day as the PFA filing the family had [Harbst] 302'd. This just made things worse, as he was only hospitalized for a few

days and then released, coming home even angrier. He began giving away large sums of money from his retirement accounts, which were his and Bonnie's primary assets other than their house. As for the house, he told Bonnie that she would get her half of it "in a bucket of ashes." This led Bonnie to file for divorce, as she was concerned that if she did not, she would be left penniless, as her only source of income is a small Social Security benefit.

With [Harbst's] behavior worsening and his threats growing more specific, the family attempted to have [him] 302'd two more times. Each time he was released from the hospital after being there only a few hours. They also reached out to the police for help, to no avail. When [Harbst] went on his destructive rampage on the morning of June 6th, it was their worst fears realized.

Trial Court Opinion, 6/22/23, at 1-3.

Following trial, a jury convicted Harbst of attempted homicide, two counts of arson, aggravated arson, aggravated assault, criminal mischief, and recklessly endangering another person ["REAP"].[1]

The trial court sentenced Harbst to an aggregate term of 123 to 246 months' incarceration and gave him credit for time served. Harbst did not file a post-sentence motion.

Harbst filed this timely appeal. He and the trial court complied with Pennsylvania Rule of Civil Procedure 1925.

Harbst raises the following single issue for our review:

I. Whether the evidence presented at [t]rial was insufficient to support [Harbst's] convictions for attempted homicide, arson-

_____

[1] 18 Pa.C.S.A. §§ 901(a), 3301(a)(1)(i) and (ii), 3301(a.1)(a)(1), 2702(a)(1), 3304(a)(1), and 2705. The jury acquitted him of discharge of a firearm into an occupied structure, 18 Pa.C.S.A. § 2707.1.

inhabited building, aggravated arson, aggravated assault, criminal mischief/damage property, arson-danger of death/bodily injury, and REAP, since the Commonwealth failed to prove, beyond a reasonable doubt, the elements of each of these offenses including establishing the identity of [Harbst] as the culpable actor as well as proving that the event or events could have even happened as described given the physical limitations of Harbst.

*See* Harbst's Brief at 12.

Harbst challenges the sufficiency of the evidence to sustain his convictions.[2] Specifically, he claims that the evidence was insufficient to establish that he was the one who committed the crimes.[3] Harbst maintains that no one saw him set fire to the property. According to Harbst, Bonnie's testimony that she saw him at the property was suspect since she was not wearing her glasses, and she had her own motivations to falsely implicate him. Harbst also argues his physical limitations and need to use a walker made it impossible for him to go to his son's house, set multiple fires, and return home within 15 minutes. Harbst further maintains that he did not have any guns to shoot at Bonnie because they were taken pursuant to the PFA order. Additionally, he argues that his DNA was not on the gun and there was no gun residue on him. Harbst's Brief at 33. We disagree.

---

[2] Harbst claims that he should be permitted to raise a weight claim also because he was without counsel during the ten-day period to file a post-sentence motion. Harbst's Brief at 36. We disagree. Counsel could have filed a motion to file a post-sentence motion *nunc pro* tunc but did not. Therefore, even though Harbst's arguments go more to the weight of the evidence and the trial court considered his issue as a weight claim, it is waived.

[3] Harbst concedes that the Commonwealth established all the other elements the offenses of which he was convicted. *Id.* at 39.

In reviewing a sufficiency of the evidence claim, this Court:

must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted). However, "the inferences must flow from facts and circumstances proven in the record and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt." *Commonwealth v. Scott*, 597 A.2d 1220, 1221 (Pa. Super. 1991). "The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review." *Id.* "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013).

To sustain a defendant's conviction(s), the Commonwealth must prove the statutory elements of the crimes charged beyond a reasonable doubt. Additionally, the Commonwealth must establish the identity of the defendant as the perpetrator of the crimes. *Commonwealth v. Brooks*, 7 A.3d 852, 857 (Pa. Super. 2010). A defendant's identity as the perpetrator, like any element, may be proven by circumstantial evidence. *See Commonwealth v. Williams*, 255 A.3d 565, 579 (Pa. Super. 2021). "[E]vidence of

- 5 -

identification need not be positive and certain to sustain a conviction." ***Commonwealth v. Jones***, 954 A.2d 1194, 1197 (Pa. Super. 2008). Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be considered to establish identity in conjunction with other circumstances and identification testimony. ***Commonwealth v. Minnis***, 458 A.2d 231, 233-34 (Pa. Super. 1983).

In its opinion, the trial court detailed the testimony and evidence presented at trial. Notably, Bonnie identified Harbst as the one at Gary's house the morning of incident when the fire started. Bonnie testified that she heard a utility task vehicle ("UTV") outside her son's house and saw Harbst. She knew it was him because they had been together for so long and he was on his UTV and wearing a superman t-shirt that their granddaughter gave him when he was sick. Bonnie saw him walk around the house to where her car was parked. When she went to get a better view of what he was doing, she saw her car on fire. Bonnie then went to the back of the house and saw the UTV parked under the back porch, where there was access to the basement, but Harbst was not in it. She heard noises coming from the basement and went to the top of the steps; there was a fire in the basement which was moving toward the steps. Bonnie further testified that she then saw Harbst at the front of the house on the UTV. Harbst had a rifle, shot it into the house several times, and left. When Bonnie tried to get out of the house through another door, she saw Gary's boat, parked near the door, was on fire too.

Fortunately, Bonnie was able to get out of the house as the fire rapidly spread. N.T., 7/17/23, at 110-147.

Other testimony and evidence substantiated Bonnie's testimony about the events of that morning. Gary testified that when he passed his father's house early that morning on his way to work, the front door was open, the kitchen light was on, and his UTV was parked in front. He noted that this was unusual. Gary also saw gas cans in the UTV. *Id.* at 148-72.

Gary's neighbor testified that, around 8:00 a.m., he saw a UTV heading toward Gary's house. A little while later, he heard gun shots coming from the vicinity of Gary's house. The neighbor then saw the UTV heading toward Doe Run Road. At the time, he did not recognize who was driving but later realized it was Harbst. *Id.* at 204-14.

Harbst's neighbor testified that, around 8:15 a.m., she noticed that his UTV was gone. Shortly thereafter, she saw Harbst quickly cut across the yard in his UTV and park it in front of his house. *Id.* at 220-229.

Members of the Pennsylvania State Police testified regarding the significant evidence found at the scene of the fire and Harbst's house. Upon their arrival at Harbst's house, the police arrested him. One of the troopers testified that, when he searched Harbst, he found a lighter. Another trooper, who transported Harbst to the station, testified that she smelled gasoline emanating from him and that he was clammy and sweating. *Id.* at 215-33.

A third trooper, who conducted the investigation, testified that Harbst was wearing a superman t-shirt and jeans that day, like Bonnie had indicated.

A photo of him wearing this attire was admitted into evidence. The trooper further testified about the evidence he discovered. At the scene of the fire, he found three diesel cans and a gas can, one of which was empty, and several casings. At Harbst's house, the trooper discovered more gas cans, three in the UTV and another next to the house. In Harbst's UTV, the trooper found a wallet, a can of chewing tobacco, a lighter, a plastic bag of live .22 rifle shells on the seat, a spent .22 cartridge on the floor, a cane, a hand siphon with a pump on top, and a storage container with candles, a lighter, wrenches, and a siphon part. In the opened glove box, the trooper found a handwritten letter which said, *inter alia*, "I hope both houses burn to the ground with her & I in them." In Harbst's Jeep, the trooper found another handwritten note. It stated, "Thank you Judge. You caused this. Only listen to the whore." Next to this note was a picture of Harbst and Bonnie with the word "whore" on it and an arrow pointing to her. Additionally, a copy of the PFA order was found which included a handwritten note on it, "Thank you Judge." **Id.** at 313-341.

There was testimony that, the day after the fire, some friends and family searched for the rifle. They found it along Doe Run Road, about 600-800 yards from Gary's house, where Gary's neighbor saw Harbst headed that morning after hearing gunshots. **Id.** at 180-182, 192-194.

Based upon our review of the record, we conclude that the evidence, viewed in the light most favorable to Commonwealth, was sufficient to establish that Harbst was the one who set fire to his son's house and shot at Bonnie, attempting to kill her. Although no one saw Harbst actually set the

fires, Bonnie identified him as being at Gary's house that morning and in various locations about the house where fires were. Additionally, she saw him shooting a rifle into the house where she was. This alone was sufficient to establish that he was the perpetrator of the crimes.[4] ***See Commonwealth v. Patterson***, 940 A.2d 493, 502 (Pa. Super. 2007). Notwithstanding this, there was ample physical and testimonial evidence to corroborate Bonnie's testimony. And, as the trial court noted, Harbst "admitted to writing the letter that was found in his UTV—a letter which was entirely consistent with his actions." Trial Court Opinion, 1/22/24, at 46. Therefore, the Commonwealth presented sufficient evidence to sustain Harbst's convictions.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/06/2024

---

[4] Any issue as to the veracity or accuracy of this goes to the weight of the evidence. ***See Commonwealth v. Johnson***, 180 A.3d 474 (Pa. Super. 2018). As discussed above at footnote 2, however, Harbst waived this claim. Even if he had not, we are not permitted to second-guess the manner in which the jury weighed the evidence. ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. Super. 2000).