J-S08028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHAWN NASIM CONNELLY | : | |
| | : | |
| Appellant | : | No. 1004 MDA 2022 |

Appeal from the Judgment of Sentence Entered May 13, 2022
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0005480-2019

BEFORE:   OLSON, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED AUGUST 16, 2023**

Shawn Nasim Connelly (Appellant) appeals from the judgment of sentence of life imprisonment without parole imposed in the Lancaster County Court of Common Pleas, following his jury conviction of, *inter alia*, first-degree murder and attempted murder[1] for a June 2019 double shooting.  On appeal, Appellant argues the trial court erred in denying his pretrial motion to suppress his identification by the surviving victim and challenges the sufficiency and weight of the evidence presented at trial identifying him as the shooter.  For the reasons below, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] *See* 18 Pa.C.S. §§ 2501(a)(1) and 901(a), respectively.

The facts underlying Appellant's identification as a suspect and his subsequent conviction were summarized by the trial court as follows:

In the early morning hours of June 16, 2019, . . . the Lancaster City Bureau of Police ("LCBP") responded to a call in the area of the 600 block of Lafayette Steet, Lancaster, reporting a shooting. Upon arrival[,] officers found victim Anthony Marshall with a gunshot wound through his left chest area, with an exit wound in his back, and victim Tyquane Christian with a gunshot wound in his right arm; police determined that Mr. Marshall was Mr. Christian's father. Shortly after arrival at Lancaster General Hospital ("LGH"), Mr. Marshall died from his wounds.

Through their investigation LCPB Officers and Detectives learned that the altercation resulting in the death of Mr. Marshall and injuries to Mr. Christian began earlier in the night at [a] house party at 610 Lafayette Street, Lancaster, when Mr. Marshall and Mr. Christian attempted to intervene in a fight happening outside the residence between Josean Maldonado and a then unidentified man. Mr. Maldonado broke free and ran away from the home. At the same time, recovered surveillance videos showed Mr. Marshall and Mr. Christian departing 610 Lafayette Street when they were quickly approached by four men, one of whom pulled a firearm from the waist band of his pants. The shooter fired five shots in the direction of the victims, striking both, as well as [a] residence . . . and a 2000 Honda Accord.

On June 18, 2019, Officers [Adam] Flurry, [James] Boas, and [Jason] Hagy of LCBP reviewed the surveillance videos.[2] All three officers were familiar with and positively identified the shooter as Appellant[;] all three officers also positively identified the other three individuals with Appellant at the time of the shooting as Naheem Gorham, Kristen Hodge-Majette, and a juvenile, R.H.

[Shortly after the shooting, then Detective, now Sergeant, Todd Grager spoke with Mr. Maldonado's parents who claimed they had "information on who shot" Mr. Christian. **See** N.T. Trial,

---

[2] Officers Flurry, Boas, and Hagy were members of the Selective Enforcement Unit, which is the "drug and vice unit" in the department. N.T. Suppression H'rg, 12/20/21, at 49.

2/7/22, at 212-13. Sergeant Grager asked them to forward the information to him in an email, which they did. ***See id.*** The email contained a photograph of several males with "one male in particular . . . circled in red[.]" ***Id.*** at 214. Sergeant Grager later identified that male as Appellant. ***Id.***]

[The night of the shooting, after] Mr. Christian was stabilized and brought to a private room at LGH, . . . Sergeant[ ] Grager asked [him] if he knew who shot him, but [Mr. Christian] was unable to supply any details aside from the fact that four black men approached [him] and his father, and one of the men shot them.

After his release from the hospital then Detective, now Sergeant [Eric] McCrady and Detective [Thomas] Ginder from LCBP met Mr. Christian [a second time] at his mother's home where he was recovering from his injuries on June 21, 2019. During that meeting, detectives presented Mr. Christian with three photographic arrays, asking if there was anyone in the photographs he remembered being present the night of the shooting. Mr. Christian identified Naheem Gorham and Kristen Hodge-Majette as being present at the shooting and Appellant as being the other party in the fight with Mr. Maldonado; Mr. Christian did not identify Appellant as "Shawn Connelly," but instead used the nickname "Shiz."[3]

On August 28, 2019, Mr. Christian met with Sergeants Grager and McCrady [a third time] at the LCBP station for a follow[-]up interview. At that time, Mr. Christian reiterated his account of the events from June 15-16, 2019, identified [Gorham] and . . . Hodge-Majette as being two of the four men present at the shooting, and Appellant, Shiz, as being the other party involved with the fight with Mr. Maldonado.

Following this meeting, Sergeant McCrady sought and received approval from the Lancaster County District Attorney's Office to show Mr. Christian the surveillance videos recovered by police. On August 30, 2019, Mr. Christian met with investigators once more at the LCBP station with the purpose of watching the surveillance videos, at which, after watching, Mr. Christian pointed out the four men and identified each by name (or known

---

[3] Appellant's nickname is spelled "Shizz" in the trial transcript. However, we will use the same spelling as the trial court in its opinion.

nickname).  Mr. Christian was also able to positively identify the shooter in the videos as Shiz, or [Appellant].

Trial Ct. Op., 10/28/22, at 1-4 (record citations omitted & paragraph break added).  Sergeant McCrady stated that Mr. Christian claimed he did not "initially see [Appellant] because he was standing behind Mr. Gorham."  N.T. Trial, 2/8/22, at 425; *see also* N.T. Suppression Hrg, 12/20/21, at 92-93, 125.

Appellant was subsequently arrested and charged with first-degree murder, attempted murder, firearms not to be carried without a license, and two counts of discharging a firearm into an occupied structure.[4]  On June 15, 2020, Appellant, then represented by the Office of the Public Defender, filed an omnibus pretrial motion asserting, *inter alia*, his identification as a suspect was "unreliable and unduly suggestive."  **See** Appellant's Omnibus Pretrial Motion, 6/15/20, at ¶ 191.  It does not appear from the record that the trial court ever ruled on this motion.

On April 22, 2021, Richard Coble, Esquire, entered his appearance as privately retained counsel.  Attorney Coble filed a (second) suppression motion on November 18, 2021, asserting Mr. Christian's identification of Appellant as the shooter was unreliable and the result of unduly suggestive and coercive police procedures.  **See** Appellant's Motion to Suppress, 11/18/21, at 4-6 (unpaginated).  The trial court conducted a suppression hearing on December 20, 2021, at which time both Sergeants Grager and

_____

[4] **See** 18 Pa.C.S. §§ 6106(a) and 2707.1(a), respectively.

McCrady testified. The Commonwealth also admitted into evidence the photo arrays, from which Mr. Christian identified Appellant and his cohorts, as well as the relevant surveillance video footage of the shooting. **See** N.T., Suppression Hrg, at 52-53, 84-99. At the conclusion of the hearing, the trial court denied Appellant's motion.

The case proceeded to a jury trial commencing on February 7, 2022. On February 10th, the jury returned a verdict of guilty on all charges. **See** N.T. Trial, 2/10/22, at 707-08. However, the court subsequently granted Appellant's motion for judgment notwithstanding the verdict on the firearms non-licensure charge because the Commonwealth did not establish the "length of the firearm" allegedly used in the shooting.[5] **See id.** at 710-11. Appellant proceeded to sentencing on May 13, 2022, at which time the court imposed a mandatory term of life imprisonment for his conviction of first-degree murder, a consecutive term of 9 to 20 years' incarceration for attempted murder, and two terms of 3½ to 7 years' incarceration for discharging a firearm into an occupied structure, imposed to run concurrently with each other but consecutively to the first-degree murder sentence.

On May 23, 2022, Appellant filed a timely post-sentence motion, challenging the weight and sufficiency of the evidence to support his

---

[5] **See** 18 Pa.C.S. § 6102 (defining a "firearm" as "[a]ny pistol or revolver with a barrel length less than 15 inches [or] with an overall length of less than 26 inches").

conviction, and asserting a purported **Brady**[6] violation and a violation of Pennsylvania Rule of Criminal Procedure 645(C).[7] The trial court denied the motion on June 17, 2022, and this timely appeal followed.[8]

Appellant presents the following three issues for our review:[9]

I. Did the trial court err by failing to suppress [Appellant's] identification resulting from unduly suggestive police procedures?

II. Did the Commonwealth present sufficient evidence to prove [Appellant] was the perpetrator where the only evidence linking him to the crime was witness identifications from video, and the Commonwealth offered no corroboration or reason why the witnesses were better suited to make the identification than the jury?

III. Did the trial court commit reversible error by denying [Appellant's] post-sentence motion seeking a new trial because the verdict was against the weight of the evidence?

Appellant's Brief at 5.

In his first issue, Appellant insists the trial court erred when it denied his motion to suppress his pretrial identification as the shooter. His argument is two-fold. First, he maintains the "photo array identification procedure . . .

_____

[6] **See Brady v. Maryland**, 373 U.S. 83 (1963).

[7] Rule 645 outlines the process for seating an alternate juror. **See** Pa.R.Crim.P. 645. Appellant does not raise either the **Brady** or Rule 645 claim on appeal.

[8] After requesting, and being granted, an extension of time, Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion on October 28, 2022.

[9] We have reordered Appellant's claims for ease of disposition.

was unduly suggestive because it was not administered in a double-blind fashion." Appellant's Brief at 30. Second, he asserts the police "coax[ed] Mr. Christian into identifying [Appellant] in the surveillance video by showing [Appellant's] photo to [him] several times before he made the identification." *Id.* at 33.

When considering a challenge to a trial court's order denying a suppression motion, "[o]ur standard of . . . is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." ***Commonwealth v. Jaynes***, 135 A.3d 606, 610 (Pa. Super. 2016) (citation omitted). In making those determinations,

> [w]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

> Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.

*Id.* (citations omitted).

> Furthermore, we emphasize:

> Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. **Identification evidence will not be suppressed unless the facts demonstrate that the**

> **identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.** Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics.

***Commonwealth v. Mbewe***, 203 A.3d 983, 986–87 (Pa. Super. 2019) (citations & quotation marks omitted; emphasis added).

First, Appellant insists that the photo array procedure was suggestive because it was not administered in a double-blind fashion, that is "the array's administrator [Sergeant Grager] knew who the suspect was."  Appellant's Brief at 30.  He emphasizes that "[s]everal states now have laws requiring double-blind administration" and that "voluminous independent research shows that [an] identification procedure, which was not double-blind, is inherently and unduly suggestive." ***Id.*** at 31, 32.

Upon our review of the record, we conclude this particular argument is waived.  Although the preference for "blind or blinded photo arrays" was referenced in the first suppression motion filed by former counsel in June of 2020[10] — a motion that was never ruled upon — it was not raised in the second suppression motion filed by present counsel in November of 2021.  Moreover, at the suppression hearing, Appellant's counsel did not ask Sergeant McCrady any questions regarding his composition of Appellant's photo array or highlight any purported suggestive techniques employed by the sergeant in compiling

---

[10] ***See*** Appellant's Omnibus Pre-trial Motion, 6/15/20, at ¶ 209 (noting federal investigators are "encourage[d]" to employ "blind" photo arrays).

the array. *See* N.T., Suppression Hrg, at 100-32, 135-38. Furthermore, counsel's argument at the conclusion of the hearing did not address any purported suggestiveness in the photo array compilation, but rather focused on the fact that Mr. Christian identified Appellant as the shooter in the surveillance video only after having failed to identify him when presented with his photo array on two prior occasions. *See id.* at 140-44. Counsel neither advocated for a "double-blind" photo array procedure, nor presented any of the purported "voluminous" research studies on the topic. *See* Appellant's Brief at 32. Thus, Appellant's contention that the photo array should have been administered "double blind" is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Moreover, even if we did not find this claim waived, Appellant would be entitled to no relief. As this Court explained in *Mbewe*, "[s]uggestiveness in the identification process . . . alone does not warrant exclusion . . . unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Mbewe*, 203 A.3d at 986 (citations & quotation marks omitted). Here, Appellant has failed to demonstrate how the procedure used by Sergeant McCrady to compile the photo array and present it to Mr. Christian gave "rise to a very substantial likelihood of irreparable misidentification." *See id.*

Appellant's second suppression argument focuses on the fact that Detective McCrady showed Appellant's photo to Mr. Christian on two different occasions before Mr. Christian identified Appellant as the shooter in the surveillance video. *See* Appellant's Brief at 34. Relying on a decision of the Supreme Court of New Jersey and two mugshot identification studies, Appellant asserts "[i]dentification procedures involving more than one viewing of the same suspect can create a risk of mugshot exposure and mugshot commitment" which may then affect the reliability of a subsequent identification. *See id.* at 33-34, *citing* **State v. Henderson**, 27 A.3d 872 (N.J. 2011). Appellant, however, fails to cite any **precedential** authority to support his claim. Rather, he simply asserts that "[b]y repeatedly showing Mr. Christian photo arrays that included [Appellant], the police non-verbally communicated that they were not satisfied with his previous identifications." Appellant's Brief at 35.

The trial court addressed Appellant's suppression challenge as follows:

Appellant argues that the tactics used by LCBP's officers were so unduly suggestive that it led to an unreliable identification of Appellant by Mr. Christian[.] Appellant is mistaken. At the suppression hearing, Sergeants Grager and Mc[C]rady clearly detailed each interview with Mr. Christian, and no evidence presented supports a finding that any of the four instances where Mr. Christian interacted with police gave rise to a substantial likelihood of irreparable misidentification. [W]e know that Appellant's main concern with the identification process is that Mr. Christian did not identify Appellant as the shooter, or as being present at the shooting, until he viewed the surveillance videos on August 30, 2019, during his fourth interview with police.

In his motion to suppress, Appellant states LCBP took advantage of Mr. Christian as an interested party in the case and

"pressured him through numerous and repetitive interviews in an attempt to compel an identification" of Appellant as the shooter. At no point during the suppression hearing was testimony elicited that would suggest pressure or force was used. In fact, the witnesses testified multiple times that Mr. Christian was very cooperative and was willing to help police in any way he could. Moreover, as acknowledged multiple times during the hearing, there was a lapse of more than two months between Mr. Christian's second and third interviews, which does not suggest to this court that the interviews were n[u]merous or repetitive or that Mr. Christian felt any pres[s]ure to interact with police at all.

There is no evidence of record showing Mr. Christian was compelled to identify the shooter. During the three interviews following his release from the hospital, Mr. Christian identified Appellant[ ] as being present the night of the shooting each time. Appellant implies that because [Mr. Christian] did not conclusively state Appellant was the shooter until he saw the surveillance videos his identification [was] unreliable. However, "[i]nitial equivocation does not render later identifications constitutionally unreliable *per se*." Mr. Christian stalwartly identified Appellant as being present the evening of June 15-16, 2019, even though he was not initially sure of the identity of the shooter. The explanation for Mr. Christian believing another suspect could have been the shooter was simply that Mr. [Gorham] was the man closest to him when the shooting occurred, and Appellant was standing directly behind Mr. [Gorham], which allowed Mr. Christian to initially believe the shooter was Mr. [Gorham]. Assuming, *arguendo*, there was suggestiveness in the identification process, nothing of record gives rise to the level that there was a very substantial likelihood of irreparable misidentification.

. . . In viewing the totality of the circumstances surrounding the identification process of Appellant by Mr. Christian, this court found both witnesses and their testimony to be credible, and found it more likely than not that the identification process was not unduly suggestive. Appellant's claim of unduly suggestive tactics by police resulting in an unreliable identification by Mr. Christian of Appellant as [the] shooter is without merit.

Trial Ct. Op. at 8-10.

We detect no error of law or abuse of discretion in the trial court's ruling. As the court explains, there was no evidence to suggest the officers coaxed or coerced Mr. Christian into identifying Appellant as the shooter. Although the officers met with Mr. Christian four times, the first time was immediately after the shooting while Mr. Christian was still in the hospital. *See* N.T., Suppression Hrg, at 7-12. While he provided a timeline of the events leading to the shooting, Mr. Christian was unable to identify any of those involved. *See id.* at 17-22, 32.

Approximately a week later, after Mr. Christian was released from the hospital, Sergeant McCrady and Detective Ginder met with him at his mother's residence and, for the first time, showed him the photo arrays. *See* N.T., Suppression Hrg, at 56-57, 59. The officers asked Mr. Christian "if he noticed anyone within . . . the photographic array[s] that was there the night of the shooting." *Id.* at 59. They also directed him not to "guess" and stated, "if you don't know, you don't know." *Id.* Appellant identified both Mr. Gorham and Mr. Hodge-Majette as being present when he and his father were shot. *See id.* at 60, 64-65. He also positively identified Appellant as the "subject that was in the altercation with [Mr.] Maldanado at 610 Lafayette Street." *Id.* at 66. Sergeant McCrady described Mr. Christian as "very cooperative." *Id.* at 69.

Sergeant McCrady met with Mr. Christian for a "follow-up interview" on August 28, 2019. *See* N.T., Suppression Hrg, at 72. He explained that the two-month delay was due to the fact that Mr. Christian's "recovery took longer

than usual" and "scheduling was an issue[,]" but that Mr. Christian "voluntarily [came] to the station[.]" *Id.* at 72-73. Mr. Christian provided the same account of the events which had occurred on the night of the shooting, including the fact that Appellant was the person in an altercation with Maldonado, and once again, positively identified Appellant in the photo array. *See id.* at 74-75, 78.

Sergeant McCrady then obtained permission from the Lancaster County District Attorney's Office to show Mr. Christian the video surveillance footage of the shooting. *See* N.T., Suppression Hrg, at 81. He "invite[d]" Mr. Christian to come back to the station, and Mr. Christian did so "voluntarily[.]" *Id.* at 82. Upon witnessing the shooting on the video, Mr. Christian identified Appellant (Shiz) as the shooter. *Id.* at 89. Sergeant McCrady described Mr. Christian as "visibly upset" because "he thought someone else had shot him[.]" *Id.* at 88-89. Mr. Christian explained that "it happened so quickly" it was not until "he was able to see the video and see it play out" that he was able to identify Appellant as the shooter. *Id.* at 90. Sergeant McCrady also pointed out that Appellant was standing "directly behind" Mr. Gorham on the video. *Id.* at 92.

Accordingly, our review of the testimony and evidence presented during the suppression hearing supports the court's ruling. There is simply nothing in the identification procedure to support Appellant's allegation that Mr. Christian's identification of him was the result of suggestive police practices. Furthermore, the non-binding New Jersey decision upon which Appellant relies

is distinguishable. In **Henderson**, the Supreme Court of New Jersey crafted a new procedure for assessing eyewitness identification based on a significant amount of scientific evidence produced at a prior trial court hearing. **See Henderson**, 27 A.3d at 877-78. Further, in that case, the eyewitness testified that he felt as though the police were "'nudging' him to choose [the] defendant's photo, and 'that there was pressure' to make a choice." **Id.** at 881. Here, Appellant presented no evidence suggesting the officers pressured Mr. Christian into making an identification, nor did Appellant present any scientific evidence challenging the identification procedure used by the officers. Thus, Appellant's first claim fails.

Next, Appellant challenges the sufficiency of the evidence identifying him as the shooter. **See** Appellant's Brief at 17. He emphasizes that his identification was based solely on Detective Flurry's and Mr. Christian's review of the surveillance video. **Id.** Appellant maintains that while this Court has not directly considered how video identification evidence can support a conviction, it has "broadly presented its view that witnesses may properly narrate a video, but . . . may not necessarily identify someone depicted in the video." **Id.** at 17, 20, *citing* **Commonwealth v. Childs**, 63 A.3d 323 (Pa. Super. 2013); **Commonwealth v. Brown**, 134 A.3d 1097 (Pa. Super. 2016); **Commonwealth v. Palmer**, 192 A.3d 85 (Pa. Super. 2018). Rather, he requests that this Court craft a rule — adopted by several federal circuit courts — that a conviction may not rest solely "on a witness's ability to identify a suspect from a video unless (1) there is substantial corroboration and (2) the

witness's familiarity with characteristics of the defendant are not immediately observable by the jury at trial[,]" such as when the defendant has changed his appearance. *Id.* at 24.

Appellant insists that neither Mr. Christian or Detective Flurry were "particularly familiar" with him, "nor did the Commonwealth have any relevant corroboration." Appellant's Brief at 24. Moreover, he emphasizes that his name "first surfaced in the investigation when [the Maldonados emailed investigators that they] 'had heard things on the street.'" *Id.* at 25. Thus, he maintains:

> Both the Special Enforcement Unit and Mr. Christian were especially likely to have encountered rumor and innuendo, perhaps even unwittingly. And that is a critical factor in misidentifications based on confirmatory feedback and confirmation bias.

*Id.* Appellant cites to several studies in support of his claim that witnesses' memories are easily tainted when they receive positive "feedback confirming the 'accuracy' of the witnesses' identification[.]" *See id.* at 25-28. He summarizes:

> Absent meaningful corroboration, this Court should hold that the Commonwealth did not present sufficient evidence to support [his] convictions because the only identification evidence was made solely through video that the factfinder could review and draw its own conclusions without the aid of witnesses.

*Id.* at 17. We conclude no relief is due.

Our review of a challenge to the sufficiency of the evidence is well-settled:

- 15 -

The standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Williams***, 255 A.3d 565, 578–79 (Pa. Super. 2021)

(citation omitted). Moreover:

[E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be considered to establish identity in conjunction with other circumstances and identification testimony.

***Id.*** at 579 (citations omitted).

Here, Appellant's claim focuses less on whether the Commonwealth actually proved he was guilty of the crimes charged, including first-degree murder,[11] and more on the alleged impropriety of permitting two witnesses to

_____

[11] "In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with
*(Footnote Continued Next Page)*

- 16 -

identify him *via* surveillance video footage. Thus, his argument appears to challenge the court's admission of the eyewitness testimony evidence — an issue he did not raise in his court-order Pa.R.A.P. 1925(b) statement[12] — rather than sufficiency thereof. We conclude he is entitled to no relief.

Appellant first argues that "[i]n a trio of cases, this Court offered broad guidance on using surveillance video in criminal prosecutions[,]" and insists that while we generally permit witnesses to narrate a video, we do not "necessarily" allow a witness to "identify someone depicted in the video." **See** Appellant's Brief at 18, 20. The cases upon which Appellant relies do not support his claims.

With regard to **Childs**, Appellant implies that this Court permitted witness testimony identifying the defendant on surveillance video **only** because there was corroborating evidence. **See** Appellant's Brief at 18. In that case, the victim identified the defendant on "dark surveillance video" as the person who broke into her home; moreover, the defendant's palm prints were recovered on an open window and one of the victim's stolen items was pawned by the defendant's girlfriend. **See Childs**, 63 A.3d at 327. The

---

specific intent to kill. **Commonwealth v. Clemons**, 200 A.3d 441, 462 (Pa. 2019) (citations omitted); **see also** 18 Pa.C.S. § 2502(a).

[12] **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

defendant argued that his conviction was against the weight of the evidence because the "facts linking him to the crimes [were] too tenuous[.]" *Id.* This Court rejected the defendant's **weight claim**, noting the trial "court was shown the surveillance video that served to identify [the defendant] and was able to draw its own conclusions." *Id.*

*Childs* provides no relief for Appellant. The *Childs* Court **did not require** the Commonwealth to provide corroborating physical evidence in order to permit an eyewitness identification from surveillance video, nor did it consider whether the identification evidence was sufficient to support the verdict. Rather, the *Childs* Court reviewed the weight of the evidence. Moreover, here, like in *Childs*, both the trial court and the jury viewed the relevant surveillance video and were able to draw their own conclusions regarding the witnesses' identifications.

In *Brown*, the defendant was charged with first-degree murder following a shooting. *See Brown*, 134 A.3d at 1101. Although two witnesses initially identified the defendant as the person who shot the victim, they later recanted, and the Commonwealth was forced to introduce their "initial accounts of the shooting as prior inconsistent statements." *Id.* at 1101-02. Relevant herein, the Commonwealth also introduced surveillance video that was played for the jury, and the trial court permitted a police detective to "give limited testimony to direct the jury's attention to specific images depicted in the video." *See id.* at 1105-06. As Appellant points out, the trial court in *Brown*, however, prohibited the detective "from speculating as to the

identities of individuals seen in the footage, and instructed the jury that their own observations controlled." *Id.* at 1106. On appeal, the defendant challenged the detective's testimony as **inadmissible lay witness opinion testimony**. *See id.* A panel of this Court found no error.

Here, Appellant has challenged the sufficiency of the evidence on appeal, not the **admissibility** of the identification testimony. Moreover, the *Brown* opinion provides no context as to **why** the trial court prohibited the detective from identifying certain individuals in the video. *See Brown*, 134 A.3d at 1106. Perhaps the detective was not familiar with the individuals, or had no basis upon which make the identification. The facts in the present case are clearly distinguishable.

Similarly, in *Palmer*, the defendant challenged the **admissibility** of a detective's testimony, identifying individuals in a video, as improper lay opinion testimony. *See Palmer*, 192 A.3d at 99. In that case, the video surveillance footage of a shooting revealed "[a] man . . . extending his arm in a position consistent with firing a gun" immediately before the driver of a car passing by was struck by a bullet. *See id.* at 87. The defendant admitted he was in the area of the shooting, and his DNA was recovered from the area where fired cartridge casings were located. *See id.* at 100. The detective "identified the shooter by finding and watching the video surveillance of the shooting, then examining earlier portions of the video for other instances where the suspect appeared." *Id.* at 100-01. This Court held that the detective's testimony was properly admitted based on his perceptions of the

video footage, and that the jury was "free to reach a different conclusion if it disagreed with [the detective's] conclusion that it was [the defendant] depicted on the video at specific moments in the footage." *Id.* at 101.

Again, here, Appellant challenges the sufficiency of the evidence, not the admissibility of the witnesses' identification testimony. Moreover, while he emphasizes that there was corroboration evidence in *Palmer* — *i.e.*, the defendant's DNA at the scene — the panel did not consider whether such evidence is required in order to find an identification from a video to be sufficient. Appellant's attempt to grasp any language in these cases to support his claim fails.

We also refuse Appellant's invitation to adopt the holdings of several federal circuit courts which, he asserts, require both "substantial corroboration" and a witness' "familiarity with the characteristics of the defendant [which] are not immediately observable by the jury at trial."[13] *See* Appellant's Brief at 24. He describes these circumstances as when the defendant has changed his appearance, or when the quality of the video "is such that a reasonable factfinder would need assistance[.]" *Id.* We conclude these considerations are a proper consideration for a weight of the evidence claim, not a sufficiency claim.

---

[13] It is well-settled that we are "not bound by decisions of federal courts inferior to the United States Supreme Court[.]" *Commonwealth v. Ragan*, 743 A.2d 390, 396 (Pa. 1999).

In the present case, Detective Flurry testified that when he and two other members of the Selective Enforcement Team were asked to review the surveillance video of the shooting, he was generally aware that there had been a shooting but was **not** aware of any "persons of interest," including Appellant. *See* N.T. Trial, 2/9/22, at 529. Rather, Sergeant McCrady told them "he had a couple of videos that he wanted us to look at to see if we could recognize anybody that was in the videos." *Id.* at 531. Detective Flurry testified that he had "multiple observations and/or interactions" with Appellant from 2017 until the spring of 2019. *Id.* at 524. He stated that he was "[w]ithin arm's reach" of Appellant "[a]t least once[,]" and was "familiar with [Appellant's] physical features and characteristics as of June of 2019[.]" *Id.* at 525. Although Appellant's face was not clearly depicted on any of the surveillance videos, Detective Flurry described in detail how he identified Appellant based upon his body type, jaw line, complexion, hairline, and positioning of tattoos. *See id.* at 538-46. He also explained that Appellant was known to "associate" with two of the other men present at the shooting. *See id.* at 578. We conclude that the detective's familiarity with Appellant was sufficient to permit him to identify Appellant on the surveillance video. Whether his identification was credible was for the jury — who also viewed the surveillance video — to decide. *See Williams*, 255 A.3d at 578-79.

Moreover, although Mr. Christian did not have any interaction with Appellant prior to the night of the shooting, he positively identified Appellant as the person who was in an altercation with Mr. Maldonado earlier that

evening. According to Sergeant McCrady, when he showed Mr. Christian the surveillance video, Mr. Christian "started to feel a little sick" because "he didn't know that [Appellant] was behind Mr. Gorham." N.T. Jury Trial, 2/8/22, at 423, 425. However, he "[f]airly quickly, . . . maybe [within] a minute[,]" identified Appellant as the shooter. *Id.* at 425.

Furthermore, at trial, Mr. Christian testified that he actually remembered Appellant was the person who shot him "days after [he] had been in the hospital[,]" but he "was just in too much shock" and not "in the right state of mind" to identify him prior to viewing the video surveillance footage. *See id.* at 370. To the extent that his testimony contradicted Sergeant McCrady's account, any inconsistencies was for the jury to weigh and consider. *See Williams*, 255 A.3d at 578-79.

Lastly, we note that Appellant implies that prior to their identifications, both Mr. Christian and Detective Flurry were aware of the circulating "rumor and innuendo" that Appellant was the shooter. *See* Appellant's Brief at 25. He insists that this led to "confirmatory feedback" which made the witnesses "more confident in the accuracy of [their] identification, even if [they] had identified an innocent person." *Id.* However, Appellant does not provide any record citation to support this claim, and our review reveals there is simply no evidence in the record that either Mr. Christian or Detective Flurry was aware of the purported rumors surrounding Appellant prior to their identifications. Thus, Appellant's sufficiency claim fails.

In his final issue, Appellant again challenges his identification as the shooter — this time, in a weight of the evidence claim. He insists Mr. Christian's "unbelievable testimony . . . was repeatedly contradicted by other Commonwealth witnesses[,]" and Detective Flurry's "vague testimony" identifying Appellant in the surveillance video "merited no weight." Appellant's Brief at 36. Indeed, Appellant notes that Detective Flurry "gave only general physical characteristics to establish the perpetrator's identify" and conceded he could not distinctly see the culprit's face or tattoos. *Id.* at 39. Accordingly, he contends the trial court abused its discretion when it denied his weight of the evidence claim. *See id.* at 40.

Preliminarily, we note Appellant properly preserved his weight claim in a timely filed post-sentence motion. *See* Pa.R.Crim.P. 607(A)(1)-(3) (challenge to weight of the evidence must be raised before trial court); Appellant's Post-Sentence Motion for New Trial, 5/23/22, at 7-11. Our review is well-established:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.
>
> The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of discretion by the trial court, not the

- 23 -

underlying question of whether the verdict was against the weight of the evidence. The appellate court reviews a weight claim using an abuse of discretion standard.

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1080 (Pa. 2017) (citations & quotation marks omitted; paragraph break added).

Here, the trial court considered and rejected Appellant's contention that his conviction was against the weight of the evidence. ***See*** Trial Ct Op. at 18. The court opined that upon a "thorough review of the testimonial evidence, [it could] find no issues concerning the credibility of the testimony given by any witness, and specifically Mr. Christian and law enforcement officers." ***Id.*** Further, the court stated Appellant "did not offer or elicit testimony contradicting the testimony of" the Commonwealth's witnesses. ***Id.***

Appellant first notes that Mr. Christian's account of his and his father's activities prior to arriving at the house party differed from the account provided by his father's friend, who accompanied them for part of the evening. ***See*** Appellant's Brief at 37-38. These discrepancies concerning events **prior** to the shooting, however, do not impact Mr. Christian's identification of Appellant.

Appellant also emphasizes that "Sergeant McCrady twice admitted that Mr. Christian's testimony differed from his statements to the police" — specifically, regarding the fact that he knew Appellant shot him before he viewed the surveillance video footage, and his trial testimony that he did not

identify Mr. Gorham and Mr. Hodge-Majette.[14] **See** Appellant's Brief at 38. However, despite these inconsistencies, the trial court found "Mr. Christian's identification was not unreliable." Trial Ct. Op. at 16. We detect no basis to disagree. Regardless of whether the jury believed Mr. Christian knew who shot him immediately after the incident and for some reason did not tell police, or he did not initially notice Appellant standing behind Mr. Gorham until he saw the surveillance footage, he positively identified Appellant as the shooter — as did Detective Flurry. Moreover, the jury (as well as the trial court) was able to view the surveillance video and assess the reliability of both witnesses' identifications. Although Detective Flurry candidly admitted that he identified Appellant based on his physical characteristics, not facial recognition, again, the jury was able to weigh that testimony in determining whether the identification was credible. We agree with the trial court's determination that "none of the verdicts . . . shock a person's sense of justice[,]" and, therefore, Appellant's challenge to the weight of the evidence fails. **See id.** at 19.

Judgment of sentence affirmed.

---

[14] During cross-examination, Mr. Christian was asked if he was "able to identify the other two people from the photographic arrays in the video[,]" to which he responded, "No." N.T., 2/8/22, at 373. However, Sergeant McCrady later testified that Mr. Christian was able to identify the other men involved when he viewed the surveillance footage. **See id.** at 463. When Appellant's counsel's pointed out the discrepancy, the officer responded, "I'm not sure if he's confused or what." **Id.**

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/16/2023</u>